## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-808

Christopher Porter and
BreeAnna Porter,
    Plaintiffs,

v.

T.J. Crowder and Sons, LLC, and
Farrel Crowder,
    Defendants.

---

### HUMALFA AND SONS, LLC, AND FARREL CROWDER'S
### AMENDED MOTION FOR SUMMARY JUDGMENT

Now comes T.J. Crowder and Sons, LLC, and Farrel Crowder ("Humalfa") by and through

their attorney Michael J. Davis of Davis Murray Law LLC and hereby files their Motion for

Summary Judgment as to Counts 1 and 2 of Plaintiffs Christopher Porter and BreeAnna Porter

("Plaintiff") and, in support thereof, states as follows.

Certification Pursuant to D.C.COLO.LCivR 7.1: Undersigned counsel conferred with counsel

for represented party Plaintiffs and Counsel for Plaintiffs does not consent to the relief requested.

### A.  STANDARD OF REVIEW.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper when "there

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time

for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of

proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* The

moving party is responsible for informing the court of its claim and demonstrating the absence of a

1

genuine issue of material fact. But the movant need not support its motion with materials "negating the opponents claim." *Celotex*, 477 U.S. at 323.Before a court will find that a dispute about a material fact is genuine, there must be sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Hence, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). The party opposing the motion must come forward with specific facts.

**B. ISSUES PRESENTED FOR REVIEW.**

1. Whether Plaintiffs are engaged in "agricultural employment" as defined under section 3(f) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(f) or as agricultural labor under section 3121(g) of the Internal Revenue Code of 1986.

2. Whether Plaintiffs were agricultural workers under C.R.S. § 8-13.5-201(3).

3. Whether the Plaintiffs were entitled to overtime pay for work over 40 hours.

4. Whether Plaintiffs could be shorted hours by Humalfa when they self-reported their hours by text which were not altered by Crowder.

**C. ARGUMENT**

**1. PLAINTIFFS ARE ENGAGED IN "AGRICULTURAL EMPLOYMENT" AS DEFINED UNDER SECTION 3(F) OF THE FAIR LABOR STANDARDS ACT OF 1938 (29 U.S.C. 203(F) OR AS AGRICULTURAL LABOR UNDER SECTION 3121(G) OF THE INTERNAL REVENUE CODE OF 1986.**

"Agricultural laborers" are explicitly excluded from the coverage of the National Labor Relations Act. See 29 U.S.C. § 152(3). *NLRB v. Cal-Maine Farms, Inc*., 998 F. 2d 1336, 1338 (5th Circuit 1993). In a footnote, the *Cal Maine Farms* Court went on to explain in great deal the distinctions outlined in the Act and the Case Law.

2

Congress has provided that the term "agricultural laborer" shall be defined in accordance with Section 3(f) of the Fair Labor Standards Act, 29 U.S.C. § 203(f). *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 300 and n. 6, 97 S.Ct. 576, 579 and n. 6, 50 L.Ed.2d 494 (1977); see also *Amalgamated Meat Cutters & Butcher Workmen v. McCulloch*, 428 F.2d 396, 399 (5th Cir.1970). That section defines "agriculture" to encompass "farming in all its branches," including "the raising of ... poultry, and any practices ... performed by a farmer or on a farm as an incident to or in conjunction with such farming operations...." 29 U.S.C. § 203(f); see *Bayside Enterprises*, 429 U.S. at 300, 97 S.Ct. at 579. That provision defines agriculture "in both a primary and a secondary sense." Id. The primary meaning encompasses "farming in all its branches," including such practices as the cultivation and tillage of the soil, dairying, the cultivation of agricultural and horticultural commodities, and the raising of poultry. *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 762, 69 S.Ct. 1274, 1278, 93 L.Ed. 1672 (1949); *Bayside Enterprises*, 429 U.S. at 300 n. 7, 97 S.Ct. at 579 n. 7; *Camsco Produce Company, Inc*., 297 NLRB 905, 906, 1990 WL 122306 (1990). The secondary meaning "includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidentally to or in conjunction with `such' farming operations." *Farmers Reservoir & Irrigation Co. v. McComb,* 337 U.S. at 762-763, 69 S.Ct. at 1279; Bayside Enterprises, 429 U.S. at 300-301 & n. 7, 97 S.Ct. at 579 & n. 7; Chapman v. Durkin, 214 F.2d 360, 361-362 (5th Cir.), cert. denied, 348 U.S. 897, 75 S.Ct. 218, 99 L.Ed. 704 (1954).

As applied to the current case, the question is whether Humalfa processing cow manure on feed lots that Cattle have produced comes within the secondary meaning of agriculture which "includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidentally to or in conjunction with `such' farming operations." *Farmers Reservoir & Irrigation Co.* at 762.

The cattle and the manure produced by the cattle which Humalfa processes is located on the farms where the cattle are raised and fed. Ex. A, Crowder Aff., Para. 4. In *Holly Farms Corp. v. NLRB*, 517 US 392, 398 (1996), the Court quoted the relevant part of the Act as follows:

Section 3(f) of the FLSA provides:

Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 1141j(g) of title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market. 29 U. S. C. § 203(f). See *Holly Farms* at 397-398.

3

As applied to the current case, Humalfa was dealing with the raising of livestock performed on a farm in which Humalfa, more specifically the Plaintiffs, were preparing a by-product for market of that farming operation.

The fact that Humalfa handled this by-product of the cattle raising function on farms that did not belong to them for which they were contracted to perform that work affects whether the Plaintiffs were agricultural workers. As stated in *Bills v. Cactus Family Farms, LLC*, 5 F. 4th 844, 847-848 (8th Cir 2021):

> The agricultural exemption was intended to "embrace the whole field of agriculture." *Maneja v. Waialua Agric. Co.*, 349 U.S. 254, 260, 75 S.Ct. 719, 99 L.Ed. 1040 (1955). Congress specifically added the words "or on a farm" to 29 U.S.C. § 203(f) to address the concern expressed by some members of the Senate that the exemption would not otherwise cover "the threshing of wheat or other functions necessary to the farmer if those functions were not performed by the farmer and his hands, but by separate companies organized for and devoted solely to that particular job." *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 767, 69 S.Ct. 1274, 93 L.Ed. 1672 (1949).

Removing manure produced by cattle in a feed lot is "…necessary to the farmer…" and Humalfa is a company "…organized for and devoted solely to do that particular job." Hence, the Plaintiffs are workers who fall within the agricultural exemption attested to in 29 U.S.C. § 203(f) that applies to Humalfa workers because they are doing a necessary function on a farm for Humalfa which is solely dedicated to this task.

There are many other analogies that fit Humalfa's job role in relation to the feed lots. As stated in *Bresgal v. Brock*, 843 F.2d 1163, 1167-68 (9th Cir.1987) the Court pointed to the language of the FLSA and stated:

> "The added language does refer to such functions as "packaging, processing, freezing, or grading," which were not in the original definition of agricultural labor. But the amendment also covers the "handling, planting [or] drying" of agricultural commodities. These functions — if performed on a farm — are within the original definition of agricultural employment as derived from the [FLSA]." Id.

In applying that reasoning, the Court in *Morante-Navarro v. T&Y Pine Straw, Inc.,* 350 F. 3d 1163 (11th Cir., 2003) stated that:

4

We conclude that pine straw is analogous to those commodities previously deemed "agricultural or horticultural." Like tree seedlings, trees, evergreen boughs, and mushroom compost, pine straw is produced by a natural process that can be — and was in this case — enhanced by manual labor and cannot be put to commercial use without human intervention. Id. at 1172.

Further, in *United States v. Turner Turpentine Co.*, 111 F.2d 400, 404-05 (5th Cir.1940), the Court concluded that "…labor employed in the production of crude gum and oleoresin by the scarification of living pine trees was 'agricultural labor' within the meaning of the term as used in the Social Security Act." Id. at 404-405. The Court in *Turner Turpentine Co*. further reasoned that "…. notwithstanding that the production of oleoresin in a tree is a natural process, because man can speed up and enhance the process through his labor, and because the oleoresin cannot be separated into turpentine and rosin, and thus put to commercial use, without human intervention, Congress intended the term 'agricultural labor' to 'have a meaning wide enough and broad enough to cover and embrace agricultural labor of any and every kind, as that term is understood in the various sections of the United States where the [Social Security Act] operates.' Id. at 404-405.

The processes which Humalfa employs which fall into the above stated categories clearly indicates that the processing of manure on feed lots which involves grading and creating piles is a "natural process… enhanced by manual labor…" Further, the manure which Humalfa grades and stacks for creating fertilizer cannot be put to commercial use without human intervention. Last, as stated in *Morante-Navarro*, cited supra, like mushroom compost, manure needs to be gathered and processed for it to be useable. Ex. A, Crowder Aff., Para. 3 &4. All of these point to the irrevocable conclusion that the Plaintiffs are agricultural workers within the meaning of the statue because they are engaged in agricultural employment and are exempt from having to be paid overtime as claimed in this case. The basis for not paying overtime was always the fact that the Plaintiffs were classified as "agricultural workers" by Humalfa that went unchallenged by the Plaintiffs until they were terminated.

## 2. PLAINTIFFS ARE AGRICULTURAL WORKERS UNDER C.R.S. § 8-13.5-201(3).

The definition of Agricultural Workers under C.R.S. § 8-13.5-201(3) is as follows:

3) "Agricultural worker" or "worker" means a worker engaged in any service or activity included in section 203 (f) of the federal "Fair Labor Standards Act of 1938", 29 U.S.C. sec. 201 et seq., as amended, or section 3121 (g) of the federal "Internal Revenue Code of 1986", as amended. See C.R.S. § 8-13.5-201(3).

Hence, if the Plaintiffs are agricultural workers under the statutes cited above in Section A of this brief, they are also agricultural workers under C.R.S. § 8-13.5-201(3). Because of this, the Colorado statutes as to overtime do not apply to them.

3. **THE PLAINTIFFS WERE NOT ENTITLED TO OVERTIME PAY FOR WORK OVER 40 HOURS BECAUSE THE PERIOD THEY WORKED WAS PRIOR TO THE REVISION OF THE WAGE LAW APPLYING TO AGRICULTURAL WORKERS IN COLORADO.**

Agricultural workers from Colorado were exempt from overtime protections based on the FLSA exemption which resulted in the exemption of agricultural workers from both the minimum wage and overtime protections of the FLSA. Like most states, Colorado's wage laws were rooted largely in the FLSA and relied on the FLSA definition of agricultural workers. Senate Bill 21-087 ("SB87") regarding Agricultural Labor Rights and Responsibilities provided agricultural workers entitlements to the right to minimum wage and overtime protections. SB 87 was introduced as a response to Colorado and Federal law, which have exempted farm workers from overtime pay since the creation of the Fair Labor Standards Act in 1938.

The new Overtime Rules began in November 2022, with businesses required to pay workers overtime after 60 hours per week. The Colorado Department of Labor and Employment (CDLE) adopted the new rules as part of the implementation of SB 87.  See "New CDLE Rules on Agriculture Overtime and Labor Conditions" Colorado Farm Bureau, February 22, 2022.

Because the Plaintiffs claim they worked until only until February of 2022, they were not covered by the new definition of agricultural workers implemented as part of SB 87 and thus are not entitled to overtime under that bill.

4. **PLAINTIFFS COULD NOT BE SHORTED HOURS BY HUMALFA BECAUSE THEY SELF-REPORTED THEIR HOURS BY TEXT WHICH WERE NOT ALTERED BY CROWDER.**

Plaintiff makes a series of allegations about being shorted on pay. They include as follows:

1. Para. 30[1] alleges that Plaintiffs were regularly required to perform work off the clock which went unrecorded (for the purpose of calculating their pay) and uncompensated.
2. Para. 32 alleges that Defendant's secretary regularly submitted fewer hours for payment than Plaintiffs submitted to her, thereby reducing the hours for which they were compensated.
3. Para. 33 alleges that Christopher was regularly required to perform work in the evenings, nights or weekends.
4. Para. 34 alleges that Mr. Scott instructed Christopher not to record all of his time spent working in the evenings, nights and weekends. If Christopher recorded his time anyway and submitted it to Defendant's secretary, Mr. Scott instructed the secretary not to include the time in Christopher's pay.
5. Para. 35.  Defendant regularly deducted thirty minutes to an hour from Plaintiffs' time to account for lunch, even when Plaintiffs either took no lunch or only a short lunch.
6. Para. 36.  Defendant formally hired BreeAnna in December of 2021, but informally and sporadically paid BreeAnna for work she performed starting in 2019.
7. Para. 37 alleges that Beginning in 2019, BreeAnna's duties included assisting customers, performing maintenance on Defendant's equipment, cleaning, painting. and Defendant did not track her time until she was formally hired. During this time, BreeAnna worked many hours which went unrecorded and uncompensated.

This entire series of statements is hard to fathom given the manner in which the Plaintiffs worked and got compensation. Attached hereto as Exhibit B is the affidavit of Heather Day ("Day") who was prepared all payroll for Humalfa. As described in Day's affidavit, the payroll system was simple due to the fact that all Humalfa employees worked at such a distance from the main office and had very little interaction with each other. As stated in the Affidavit, Breeanna recorded Christopher's time when he worked by texting his time to Day and texted her time and Christopher's time to Day when she started working. Ex. B, Affidavit, Para.8. Further, Day states the Plaintiffs were solely responsible for getting paid for the time they reported as texted by Breeanna. Ex. B, Affidavit, Para.9. The Plaintiffs regularly submitted hours for payment and Day never made any reduction in hours because Plaintiffs reported their own hours by text and they worked unsupervised. Ex. B, Affidavit, Para.10. Day further states the Plaintiffs did not record their time on paper but simply texted their time

---

[1] All paragraphs quoted are taking from Plaintiffs' Complaint.

to Day. That was how it was organized and how it operated from the time they began working. Day makes it clear in her affidavit that if she was texted time, it was paid.

This variance in description corresponds with all the documents turned over to Plaintiff as a result of disclosures and Humalfa's response to the Plaintiffs request to produce. For instance, the Plaintiffs claim that Breeanna worked but didn't get paid. Yet all she had to do was text her hours and she would get paid. The allegation that they worked off the clock is particularly troublesome since the only clock that recorded time was the clock they possessed. In fact, all the charges about working off the clock or being told to work off the clock by another employee seems fabricated since they reported their own time, and it was paid. The system in place completely eviscerates any allegations they make about time or not being paid for working. Because the Plaintiffs were the masters of their own fate, they were the captains of their own souls[2] and cannot make claims that someone else was responsible for what they were charged with doing.

### D.  CONCLUSION

Because the Plaintiffs are engaged in "agricultural employment" as defined under section 3(f) of the Fair Labor Standards Act of 1938 29 U.S.C. 203(f) or as agricultural labor under Section 3121(g) of the Internal Revenue Code of 1986, they were not entitled to overtime pay. Further, because the Colorado Act takes its definition from the FLSA, and the Plaintiffs ceased working before Colorado amended its Act applying to overtime pay for Agricultural Workers, the Plaintiffs were further disqualified from receiving overtime pay. Finally, because the Plaintiffs were responsible for reporting their own hours by text to their employer and those hours were not changed, any allegation about being shorted pay cannot be true. For these reasons, Plaintiff's Complaint must be dismissed.

---

[2] Quote from William Ernest Henley's "Invictus"

Respectfully submitted this 11th day of April, 2023.

/s/ *Michael J. Davis*
Michael J. Davis
Murray Davis Law LLC
1001 Bannock Street
St. 219
Denver, CO 80204
720-361-6036
Fax : 720-368-5262
Email: mdavis@DavisMurraylaw.com

## CERTIFICATE OF SERVICE

I, Michael Davis, certify that a true and accurate copy of the preceding was served by the District of Colorado Courts E-Filing System to all parties entitled to notice on 11th day of April, 2023.

*/s/ Michael J. Davis*