IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No. 1:22-cv-808-STV

**Christopher Porter and
BreeAnna Porter,**
        Plaintiffs,

v.

**T.J. Crowder and Sons, LLC,
And Farrel Crowder**
        Defendants.

---

### DECLARATION OF CHRISTOPHER PORTER

---

I, Christopher Porter, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1. My name is Christopher Porter, and I am over the age of 18 and duly qualified to execute this declaration.

2. I am a resident and domiciliary of Yuma County.

3. I was employed by T.J. Crowder and Sons, LLC, and Farrel Crowder (collectively "Defendants"), from 2007 through February of 2022.

4. Defendants own and operate a company that composts cattle manure into organic fertilizer. Defendants operate their company under the name of "Humalfa," and their website can be seen at www.humalfa.com.

5. During the last three years of my employment with Defendants, I worked as a Production Manager. I oversaw the composting of the fertilizer and assigned other

employees to various tasks surrounding that activity, so I'm familiar with the processes required to turn cow manure into the fertilizer Defendants sold.

6. Defendants don't own their own cattle, nor do they raise cattle at the fertilizer processing facility or at adjacent or affiliated farms. Instead, Defendants contract with independent cattle ranchers and feed lots throughout Colorado. I'm not really sure what all goes into the contract, but Defendants send employees, such as my wife, BreeAnna, to these farms to collect the manure the cows produce.

7. The feed lots and cattle farms Defendants collect from are not a part of Defendants' processing facility. Defendants don't own any of them, and they're all at least an hour away, if not more. There's no association between the feed lots and Defendants except the manure contract.

8. None of Defendants' employees handle the cattle we collect manure from because the cows didn't belong to Defendants. The cows were present in the feed lots when we collected their manure, but we didn't try to move them or handle them in any way. We just worked around them.

9. We moved the manure into windrows at the feed lots where the manure was collected to compost it. A "windrow" is just a fancy farm word that means we put the manure into lines. We had a windrow turner that we used to flip and turn the manure into powder. We turned the compost once a week. It depended on if the machine was working, but usually once a week. Depending on the moisture levels, the compost would heat up, which would break the compost down over the course of about eight weeks. After eight weeks, we screened it, which just means taking the big chunks out to let it compost again, or if it was ready, we sent it out as product. It wasn't ready until it was full and loamy.

Properly processed fertilizer builds up and spreads a lot further the raw manure we collected.

10. When it was ready, the farmer who owned the feed lot we collected from would spread it out over his fields. Depending on the contract the farmer had with Defendants, sometimes we would spread the manure for the farmer. But we didn't work for the farmer and didn't interact with any of the farmer's employees. Defendants told us whether and where to spread the manure.

11. Throughout my employment with Defendants, I was always paid an hourly rate for all of my hours worked without an overtime premium.

12. I regularly worked more than 40 hours in a week. My day-to-day duties usually required me to work at least 9- or 10-hour days, and I was regularly called back in to work after-hours to fix an issue or take care of some other unexpected problem. Our compost haulers were always breaking down on the way back to the processing facility, so I would be called up to go fix the trucks. On some occasions, the haulers would show up at my home with the expectation that I would work on it right then.

13. I estimate I probably worked at least 55 to 60 hours per week.

14. Defendants wanted me to keep my time in a variety of ways during my employment, but most recently I was supposed to clock in and out on an app I had to download on my phone. The app never really worked and constantly locked me out, so BreeAnna would just text my hours (and hers while she was employed) to Heather Day, who was Farrel Crowder's secretary.

15. Ms. Day regularly got my and BreeAnna's hours wrong on our paychecks. BreeAnna reported our hours accurately, but our paychecks were regularly adjusted so

that we were paid for fewer hours than we actually worked. BreeAnna complained to Ms. Day about the discrepancies several times, but our paychecks were never corrected.

16. In fact, I never received a paycheck at all for my last week of employment, which was February 13–22, 2022.

17. Finally, I know my pay checks aren't accurate because a lot of the work I performed was not included. For example, if a hauler broke down after-hours on its way back to the processing facility, I had to go fix it, but I wasn't allowed to report those hours. My supervisor, Casey Scott, told me that because it wasn't part of my regular workday it wasn't compensable work, but I had to do it anyway or I would be fired.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on this 27th day of April, 2023.

_____
**CHRISTOPHER PORTER**