**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-808-STV

**Christopher Porter and**
**BreeAnna Porter,**
          Plaintiffs,

v.

**T.J. Crowder and Sons, LLC,**
**And Farrel Crowder**
          Defendants.

---

## DECLARATION OF BREEANNA PORTER

---

I, BreeAnna Porter, do hereby swear, affirm and attest as follows, based upon my personal knowledge of the matters contained herein:

1.      My name is BreeAnna Porter, and I am over the age of 18 and duly qualified to execute this declaration.

2.      I am a resident and domiciliary of Yuma County.

3.      I was employed by T.J. Crowder and Sons, LLC, and Farrel Crowder (collectively "Defendants"), from December of 2021 through February of 2022.

4.      Defendants own and operate a company that composts cattle manure into organic fertilizer. Defendants operate their company under the name of "Humalfa," and their website can be seen at www.humalfa.com.

5.      During my employment with Defendants, I worked as a manure hauler. I drove one of Defendants dump trucks to a cattle feed lot to collect manure, so I'm familiar with how Defendants procured and handled the manure they processed into fertilizer.

6.      Defendants don't own their own cattle, nor do they raise cattle at the fertilizer processing facility or at adjacent or affiliated farms. Instead, Defendants contract with independent cattle ranchers and feed lots throughout Colorado. I'm not really sure what all goes into the contract, but Defendants send employees such as myself to these farms to collect the manure the cows produce.

7.      The feed lots and cattle farms Defendants collect from are not a part of Defendants' processing facility. Defendants don't own any of them, and they're all at least an hour away, if not more. There's no association between the feed lots and Defendants except the manure contract.

8.      None of Defendants' employees handle the cattle we collect manure from because the cows didn't belong to Defendants. The cows were present in the feed lots when we collected their manure, but we didn't try to move them or handle them in any way. We just worked around them.

9.      We moved the manure into windrows at the feed lots where the manure was collected to compost it. A "windrow" is just a fancy farm word that means we put the manure into lines. We had a windrow turner that we used to flip and turn the manure into powder. We turned the compost once a week. Depending on the moisture levels, the compost would heat up, which would break the compost down over the course of about eight weeks. After eight weeks, we screened it, which just means taking the big chunks out to let it compost again, or if it was ready, we sent it out as product. It wasn't ready until it was full and loamy. Properly processed fertilizer builds up and spreads a lot further the raw manure we collected.

10. When it was ready, the farmer who owned the feed lot we collected from would spread it out over his fields. Depending on the contract the farmer had with Defendants, sometimes we would spread the manure for the farmer. But we didn't work for the farmer and didn't interact with any of the farmer's employees. Defendants told us whether and where to spread the manure.

11. Throughout my employment with Defendants, I was always paid an hourly rate without an overtime premium for all of my hours worked.

12. I regularly worked more than 40 hours in a week. My day-to-day duties usually required me to work at least 9- or 10-hour days. In addition to hauling manure, which could take up to 8 to 10 hours depending on which cattle farm I was collecting from on any given day, I performed general maintenance on Defendants' trucks and equipment and facilities.

13. I estimate I probably worked at least 50 hours per week.

14. I was supposed to clock in and out on an app I had to download on my phone. The app never really worked and constantly locked me out, so I just texted my hours to, Heather Day, who was Farrel Crowder's secretary. My husband, Christopher Porter, was supposed to clock in and out with the same app, but he had the same issues I did, so I sent both of our hours via text.

15. Ms. Day regularly got my and Christopher's hours wrong on our paychecks. I reported our hours accurately, but our paychecks were regularly adjusted so that we were paid for fewer hours than we actually worked. I complained to Ms. Day about the discrepancies several times, but our paychecks were never corrected.

**PURSUANT TO 28 U.S.C. § 1746, I VERIFY UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on this 27th day of April, 2023.

_____
**BREEANNA PORTER**