**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
COLORADO**

Civil Action No. 1:22-cv-808

Christopher Porter and
BreeAnna Porter,
        Plaintiffs,

v.

T.J. Crowder and Sons, LLC,
and Farrel Crowder,
        Defendants.

---

**DEFENDANTS POST-TRIAL BRIEF**

---

T.J. Crowder and Sons, LLC, and Farrel Crowder ("Defendants"), by and through their attorneys Michael J. Davis of Davis Murray Law group LLC, hereby files their Post-Trial Brief on the Issue o`f The Agricultural Exemption and in support thereof states as follows:

**A. INTRODUCTION**

This matter came before this Court on Trial on Bench Trial Day 1 held on 2/26/2024. Farrel Crowder gave his testimony and Plaintiff examined him and Defendant cross-examined him. At the conclusion of Crowder's Testimony, the Court met with counsel for each side and the parties agreed to allow the case to be bifurcated from the liability portion and requested a ruling on whether the agricultural exemption applies. Neither side made any oral closing statements, and each party was ordered to file a Post Trial Brief on the issue of whether the agricultural exemption applies in this case.

As will be indicated by Crowder's testimony as applied to the facts, the agricultural exemption clearly applies to the Plaintiffs as employed by T.J. Crowder and Sons, LLC, dba Humalfa ("Humalfa"). Plaintiffs are agricultural workers because Humalfa's activity is performed on a farm as an incident to or in conjunction with farming operations which qualifies under the definition of "agriculture". In addition, Humalfa's activity which prepares manure for market and ships it qualifies under the definition of secondary agriculture which includes preparation for market, delivery to storage or to market or to carriers for transportation to market. In addition, Humalfa's activity of preparing manure for market on a farm is included as agricultural even though it is not performed by the farmer and his hands, but by Humalfa which is a separate company organized for and devoted solely to the job of processing manure in the feed yard of cattle growers. Further, Humalfa's operations of processing manure produced by the cattle in the feed lot is necessary to the farmer and essential to the continued operations of the feed lots by processing and removing manure that allows livestock to get in and move around, eat better and stay within the regulations that govern feedlots. The Porters who worked on a farm incident to or in conjunction with farming operations of raising cattle preparing the manure for market, delivery to storage or to market were not "employees" within the meaning of the National Labor Relations Act ("the Act") and instead were "agricultural laborers" who are explicitly excluded from the coverage of the Act and thus did not qualify for overtime pay.

### B. TESTIMONY OF FARREL CROWDER

Defendant TJ Crowder and Sons, LLC ("Humalfa"), is a Colorado limited liability company doing business as Humalfa. Trans. P. 3, 20-23. Farrel Crowder ("Crowder") is the owner and manager of Humalfa (Trans. p.3, 5-7) which operates a composting company that converts raw cattle manure into organic fertilize. Trans. P.3, 2-3. Even though the manure was

processed, it was still manure. Trans. P. 37, 5-7.  The processing of manure is the only activity that Humalfa engages in. Trans. p. 39, 5-6

Part of Crowder's responsibility was hiring and firing people. Trans. p.2, 4-5. Crowder hired Chris Porter twice. Trans. P. 3, 17-20. Crowder hired Porter to haul manure out of the pens out to the compost yard. Trans. P.6, 12-13. The compost yards were located on the farm adjacent to the feed lots. Trans. P.34, 16-8.  The place where Porter worked in the final 2 1/2 years of Porter's employment was at the Yuma feed yards which was a feedlot for cattle. Trans. P. 6, ln. 22-25 to Trans. p.7 ln. 1-3.

The Yuma feedlot was owned by Five Rivers Cattle Feeding. Trans P. 7, 7-8. Humalfa basically set up shop on their property to take the raw cattle manure and enrich it and make it more valuable and useful for them. Trans. P. 7, 22-24. Humalfa doesn't own the cattle feedlots or the cattle where the manure's being processed. Trans. P. 13, 6-8. The Humalfa operation is a separate operation from the feedlot itself. Trans. p. 13, 22-23. At the Yuma feedlot, there were two compost yards, one on the north side and one on the south side. Porter's duty once the manure was hauled to the compost yard would be to dump it in windrows about 16-foot wide at the bottom where it would be turned. Trans. P.34, 17-25.

Crowder testified that his services benefitted the farmer. First, Crowder stated if the manure isn't moved out of the feedlots, the cattle would be walking around in deep manure when it's wet and cattle would get that manure stuck to their hair and the efficiency of feeding goes way down. Trans. P. 39, 1-6. Second, processing the manure on the feedyard keeps the feedlot within its Confined Animal Feeding Operation drainage permit issued by the Department of Agriculture so they don't have to dig drainage lagoons thus keeping the feedlot exempt from regulation by the Colorado Health Department. Trans. p. 38-39, 24-6. Finally, Crowder testified

the way they processed manure made the EPA happy because raw manure is very volatile and leaches into groundwater. Crowder testified that the composting process stabilizes the nutrients in raw manure, turning most of the nitrogen into organic nitrogen, which is very stable and won't leak. P., 37-38, 20-6.

Crowder contended that there are agricultural regulations which don't apply to Humalfa because Humalfa provided the service on-site for Humalfa customers. P. 8, 1-14. Crowder contended that he has always been ag exempt, that everyone in his business is ag exempt, and that his employee manual contained ag exempt language that an attorney had advised him of. P. 42, 7-14.

## C. LEGAL CONCLUSIONS

**A.     Humalfa's Activity Qualifies Under the Definition Of Agriculture.**

Humalfa's activity which is performed on a farm as an incident to or in conjunction with farming operations, qualifies under the definition of "agriculture" defined by § 3(f) of the Fair Labor Standards Act of 1938 (FLSA) which encompasses practices "performed by a farmer or on a farm as an incident to or in conjunction with such farming operations."

Crowder testified that the work they perform for feedlots all takes place on the farm. Crowder indicated in response to Plaintiff's question:

```
22   Q.  You basically set up shop on their property and you
23   take their cattle manure and, through your process, enrich
24   it and make it more valuable and useful for them, correct?
25   A.  Yes.
```
Trans. P. 7

Crowder further testified that Humalfa is an independent operation that has no connection with the feedlot except to provide services.

```
13   Okay. You don't have any sort of association or
```

4

```
14   affiliation with the cattle-farming operation except the
15   verbal agreement to do the manure contracting.
16   A.   That's right.
```
P. 14

Crowder also described in detail the process of the operation on the farm.

```
13   Q.   And what was Chris' job?
14   A.   Well, hauling that manure. Loading it on trucks and
15   hauling it from the pens on out to the yard.
16   Q.   And was the yard located on the farm or in the feedlot?
17   A.   At that particular yard, we have two compost yards on
18   the north side and one nice one on the south side.
19   Q.   And after -- so -- so Chris would -- so was it Chris'
20   duty -- so what was Chris' duty in terms of the part where
21   the -- strike that. The -- once the manure was hauled to –
22   what's that -- what section do you call the –
23   A.   The compost yard.
```
Trans. p. 34

The feedlot was not owned by Humalfa but was an independent operation.

```
3   Q.   Yeah. Now, I know that counsel asked this, but you
4   don't own the feedlot.
5   A.   No.
6   Q.   And you don't own the -- the compost part of the lot.
7   A.   Not the land, no.
```
Trans. p. 36

Hence the Humalfa operation was performed on the feedlot incident to or in conjunction with the farming operation of raising cattle.

**B.     Humalfa Prepared the Manure Product for Delivery to Market.**

Humalfa's activity which prepares manure for market and ship it qualifies under the definition of secondary agriculture which "includes preparation for market, delivery to storage or to market or to carriers for transportation to market"  29 U.S.C. § 203(f))). See also *Bayside Enterprises, Inc. v. NLRB* 429 U.S. 298, 300 (1977).

As described before, Humalfa comes in and sets up shop in the feedyard.

5

> 22  Q.  You basically set up shop on their property and you
> 23  take their cattle manure and, through your process, enrich
> 24  it and make it more valuable and useful for them, correct?
> 25  A.  Yes.  And the reason we -- we turn this manure, compost
> 1   it, on the feedyard
>
> Trans. p.7 -8

The product was prepared for market and shipped to the fields.

> 21  Q.  I'm going to say a statement to try to clear that up.
> 22  You tell me if you agree with it. Much of the composted
> 23  manure goes to fields, is applied to pasture lands not owned
> 24  by the rancher or feedlot who produced the manure.
> 25  A.  That's correct.
>
> Trans. p. 15

And when it is shipped to market it is still manure but improved.

> 5  Q.  Okay. So after you process the manure, is it still
> 6  manure?
> 7  A.  Still manure.
>
> Trans. p. 37

After it is improved it is prepared to be shipped off the farm to other places.

> 13  Q.  Yeah. The -- the fertilizer that ends up being the
> 14  result of the improvement through time of the Humalfa
> 15  process on the manure is not used to enrich the cattle of
> 16  that operator.
> 17  A.  No, it -- it's –
> 18  Q.  It goes other places?
> 19  A.  Yes.
>
> Trans. p. 46

Hence, the manure is prepared for market and shipped to market or to carriers for

transportation to market.

**C.    Humalfa's Activity Is Agricultural as It Is A Separate Company Organized For And Devoted Solely To That Particular Job.**

6

Plaintiff's counsel suggested that because the farm didn't turn the manure, it couldn't qualify as agricultural. Humalfa's activity of preparing manure for market on a farm is included as agricultural even though it is not performed by the farmer and his hands and is a separate company organized for and devoted solely to that particular job. *Bills v. Cactus Family Farms, LLC*, 5 F. 4th 844, 847-848 (8th Cir 2021).

```
1   Q.   Within the three years preceding the filing of this
2   lawsuit, Humalfa operated a composting company that converts
3   raw cattle manure into organic fertilizer?
4   A.   Yeah, basically. Yeah.
```
Trans. P.3

As stated previously, Humalfa would set up shop on the feedlot that was owned by the cattle raising entity.

```
22   Q.   You basically set up shop on their property and you
23   take their cattle manure and, through your process, enrich
24   it and make it more valuable and useful for them, correct?
25   A.   Yes.  And the reason we -- we turn this manure, compost
1    it, on the feedyard within their CFO permit, Confined Animal
2    Feeding Operation, within their drainage permit so we don't
3    have to dig lagoons or -- you know what I mean.
```
Trans.  p.7 -8

Crowder confirmed that processing manure was definitely part of agriculture.

```
23   A.   We've been doing this for years and it's kind of common
24   knowledge. You don't get more ag than dealing with cattle
25   manure; that's about as ag as it gets.
```
Trans. P. 8

Crowder further confirmed that their operation was a separate operation from the farm.

```
22   Q.   And -- and your operation is a separate operation from
23   the feedlot, itself.
24   A.   Yes.
```
Trans. p. 13

Crowder also confirmed that he did not own the real estate the feedlots were on.

> 1  Q.  Okay. Okay. And did you communicate anything about
> 2  the ownership of the underlying real estate there on – for
> 3  the feedlots?
> 4  A.  He would have known that. He knew we didn't own it.
> Trans. p.10

And Crowder stated that all they do is run the feedyard.

> 13  Q.  Okay. And do you -- and does the -- we're talking
> 14  about the Yuma yard. Do they do anything besides run that
> 15  feedlot?
> 16  A.  You mean Five Rivers?
> 17  Q.  Yeah.
> 18  A.  Yeah, that's all they do is run that feedyard. Well,
> 19  they have other feedyards.
> Trans. P. 36

Humalfa is a separate company organized for and devoted solely to the particular job of processing manure on the farms with no connection to the farm. It is included as agricultural even though it is not performed by the farmer and his hands as long as it is a separate company.

**D.    The Activity Of Humalfa Is Incident To Or In Conjunction With Farming Operations Associated With Raising Cattle.**

Humalfa's activity of processing manure on a farmer's feed lot on farms in which raising cattle on those farms is the primary activity of those farms that have feed lots falls within the secondary sense of agriculture because it is performed on a farm, and incident to or in conjunction with such farming operations associated with raising cattle. *Pacheco v. Whiting Farms, Inc.,* 365 F. 3d 1199, 1205 (10th Cir. 2004).

> 13  Q.  Okay. And do you -- and does the -- we're talking
> 14  about the Yuma yard. Do they do anything besides run that
> 15  feedlot?
> 16  A.  You mean Five Rivers?
> 17  Q.  Yeah.
> 18  A.  Yeah, that's all they do is run that feedyard. Well,

      19    they have other feedyards.
      20    Q.   Okay. But they don't -- they don't raise corn?
      21    A.   No.
      22    Q.   They don't raise crops?
      23    A.   They feed cattle.
Trans. p.36

Humalfa's business attorney wrote the employee handbook and confirmed that it was the way that Humalfa did business that made it ag exempt.

      4    A.   An attorney wrote up our employee handbook.
      10   Q.   My understanding -- and you correct me if I'm wrong –
      11   is that you -- you told the lawyer who wrote up the
      12   employment handbook that, "We are ag exempt because of the
      13   way that we do the production on-site."
      14   A.   Well, yeah, the lawyer kind of told me that.
      15   Q.   Okay. And what was the name of that lawyer?
      16   A.   Levi Williamson
Trans. p.4

Humalfa's activity is performed on a farm, and incident to or in conjunction with such farming operations associated with raising cattle. Thus, it falls under the category of secondary agriculture and its workers are ag exempt.

**E.**    **The Raising Of Livestock Is One Of The Categories Which Qualifies As Farming.**

      Humalfa's activity as described above qualifies as agriculture' which "…includes farming in all its branches and among other things includes …. the raising of livestock…and any practices …… performed by a farmer or on a farm as incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." 29 U. S. C. § 203(f). Hence, under the Fair Labor Standards Act of 1938, as amended, Humalfa providing services to feed lots falls within the secondary sense of agriculture because it is performed on a farm, and incident to or in

9

conjunction with such farming operations associated with raising cattle, thus making Humalfa workers ag exempt.

### F. Humalfa's Operations Of Processing Manure Is Necessary To The Farmer And Essential To The Continued Operations Of The Feed Lots.

Humalfa's operations of processing manure produced by the cattle in the feed lot is necessary to the farmer and essential to the continued operations of the feed lots by processing and removing manure that allows livestock to get in and move around as "incidental activities which are necessary to [the farming] process" or are "organized as an independent productive activity." *Pacheco*, cited supra at 1205-06.

The Services that Humalfa provided gave benefit to the feedlot owner by keeping the feedlot owner from having to dig ponds by operating it conjunction with the Confined Animal Feeding Operation issued by the Department of Agriculture, thus making the feedlot and the Humalfa operations ag exempt from regulation by the Colorado Health Department. Trans. P. 46, Ln. 2-23.

```
22   Q.  You basically set up shop on their property and you
23   take their cattle manure an, through your process, enrich
24   it and make it more valuable and useful for them, correct?
25   A.  Yes.  And the reason we -- we turn this manure, compost
 1   it, on the feedyard within their CFO permit, Confined Animal
 2   Feeding Operation, within their drainage permit so we don't
 3   have to dig lagoons or -- you know what I mean.
 4   Q.  Yes.
 5   A.  And that keeps us exempt as far as the State's
 6   concerned.  We don't have to -- if we went off of the
 7   feedyard or out of that CFO permitted area, then the
 8   Colorado Health Department would regulate us. Staying
 9   within their CFO permit, we -- or what they call ag exempt,
10   and we're regulated by the Department of Agriculture.
11   Q.  And I take it that what you're saying is that there are
12   agricultural regulations which don't apply to you because
13   you're able to provide the service on-site for your
```

```
14   customers.
```
p.7 -8

Crowder further confirmed that their methodology makes the feedlot facilities better by controlling wetness in the feedlot feeding pens.

```
6    Q.  And the reason it's time sensitive is if you don't get
7    it out of there, the cattle can't ingress and egress; they
8    can't move around.
9    A.  That's right. The feedyard don't like it in there.
10   Q.  Right. And because of that, it's the type of work
11   where you don't just work five days a week. As long as the
12   cattle are in there pooping, you got to deal with it.
13   A.  Well, pretty much. But now we can't -- when it's wet,
14   when we get rain or snow or anything, it takes those pens
15   quite a while to dry out. You know, we don't get in there
16   and slop around. So, you know, bad weather will sure shut
17   us down.
18   Q.  Right. You're trying to make the facilities better for
19   the farmer, not worse?
20   A.  Oh, absolutely.
```
p. 11

Finally, Crowder confirmed and emphasized how their process helped the cattle feed better.

```
24   A.  You know, just good animal husbandry practices. You
25   know, you keep a clean environment for them cattle to be fed
1    in, they feed a lot better. And so they pile this manure,
2    and that's where we come in and we load the piles and haul
3    them out to the compost yard.
```
p.33-34.

All these positive benefits demonstrated how Humalfa's operations of processing manure produced by the cattle in the feed lot is necessary to the farmer and essential to the continued operations of the feed lots by processing and removing manure that allows livestock to get in and move around.

**G.     Humalfa's Operations Align with the Legal Standards Laid Down in *Pacheco*.**

11

*Pacheco* dealt with the standards that should apply to the current case due to the similarity in the facts as applied to the law.

> "Plaintiff Veronica Pacheco sued Defendants Whiting Farms Inc. and its controlling owners alleging they failed to pay her overtime wages and terminated her employment in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219. FLSA generally requires employers to pay their employees one and one-half times the employee's regular rate of pay (overtime) for each hour worked in excess of forty hours during any given week. 29 U.S.C. § 207(a)(1). FLSA's overtime wage requirements do not apply, however, "with respect to ... any employee employed in agriculture[.]" Id. § 213(b)(12)." Id. 1201.

The Court determined the issue to be decided was whether the Plaintiff was entitled to overtime wages under FLSA's agricultural exemption. Id. at 1203.

The Court first set the standard by which the agricultural exemption should be applied as follows:

> "The agricultural exemption was meant to apply broadly and to embrace the whole field of agriculture, but it was meant to apply only to agriculture; thus the critical issue is what is and what is not included within that term." *Rodriguez v. Whiting Farms, Inc*., 360 F.3d 1180, 1185 (10th Cir.2004) (internal quotations and citation omitted). Id. at 1204.

The Court followed the definition contained in the FLSA 29 U.S.C. § 203(f) which provides as follows:

> "Agriculture" includes farming in all its branches and among other things ….the raising of livestock, …..and any practices …… performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." *Pacheco* at 1203 citing 29 U.S.C. § 203(f).

In the present case, Crowder testified that the processing of Manure was in conjunction with the farming operations of the feedlots that only raised cattle when Humalfa prepared manure for delivery to the marketplace. Trans. p.36, 22-23.

The Court then applied it to the facts of Plaintiff in *Pacheco*. The Court held that "Secondary farming encompasses any practices performed on a farm as an incident to or in conjunction with farming operations, 'including preparation for market, delivery to storage ... or to carriers for transportation to market.' " 29 U.S.C. § 203(f) (emphasis added); see also *Holly Farms,* 517 U.S. at 398, 116 S.Ct. 1396. *Pacheco* at 1204.

The Court further held that:

> Packaging employees, such as Plaintiff, then complete the job by either "delivering the pelt to storage" or "to carriers for transportation to market." See 29 U.S.C. § 203(f). …. Plaintiff is therefore engaged in secondary farming under FLSA because she performs tasks incident to and in conjunction with Defendants' other agricultural operations. *Pacheco* at 1204.

The analogy to the current case is apparent. Porter delivered raw manure to the part of the feedlot where it was processed and made ready for carriers for transportation to market, that being the farms that grew crops, where it was spread as fertilizer. As in *Pacheco* where the Plaintiffs were processing chicken pelts, Porter was processing manure.

The Court next took up the issue Defendants' processing operations changing the "raw and natural state" of the pelt thereby making the process more akin to manufacturing than to agriculture. See *Mitchell v. Budd*, 350 U.S. 473, 481-82, 76 S.Ct. 527, 100 L.Ed. 565 (1956) see *Pacheco* 1205. The Court rejected this argument " …because the "changes to the product are not substantial and the pelt itself is preserved in much the same state as it was prior to processing." *Pacheco* 1205. As applied to the present case, the manure product that was processed is still the same manure as it was prior to processing. Trans. p. 37, 5-7.

Hence, Humalfa meets all the same standards as laid out in *Pacheco* that when Humalfa took raw manure and turned it in hedgerows, it was still manure and it was being prepared for shipping because the processed manure allowed the manure to be shipped further. When

13

brought in conjunction with the other factors that the processing of the manure was done on the customers farm which was dedicated to raising cattle by a company solely dedicated to the particular act of producing processed manure, it becomes clear that the ag exemption applies under the standards laid out in *Pacheco*.

## D. CONCLUSION

Plaintiffs are agricultural workers because Humalfa's activity is performed on a farm as an incident to or in conjunction with farming operations which qualifies under the definition of "agriculture". In addition, Humalfa's activity which prepares manure for market and ship it qualifies under the definition of secondary agriculture which includes preparation for market, delivery to storage or to market or to carriers for transportation to market. In addition, Humalfa's activity of preparing manure for market on a farm is included as agricultural even though it is not performed by the farmer and his hands and is a separate company organized for and devoted solely to that particular job. Further, Humalfa's operations of processing manure produced by the cattle in the feed lot is necessary to the farmer and essential to the continued operations of the feed lots by processing and removing manure that allows livestock to get in and move around, eat better and stay within the regulations that govern feedlots. The Porters who worked on a farm incident to or in conjunction with farming operations of raising cattle preparing the manure for market, delivery to storage or to market were not "employees" within the meaning of the National Labor Relations Act ("the Act") and instead were "agricultural laborers" who are explicitly excluded from the coverage of the Act and thus did not qualify for overtime pay.

Respectfully submitted this 18th day of March, 2024.

/s/ *Michael J. Davis*
Michael J. Davis
Davis Law Group LLC
2255 Sheridan Boulevard
St. C 272
Edgewater, CO 80214
720-361-6036
Fax : 720-368-5262
Email:
mdavis@Davismurraylaw.com

## CERTIFICATE OF SERVICE

I, Michael Davis, certify that a true and accurate copy of the preceding was served by the Court's filing system, to all those entitled to notice.

 */s/ Michael J. Davis*