**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-0808-STV

CHRISTOPHER PORTER and BREANNA PORTER,

Plaintiffs,

vs.

T.J. CROWDER and SONS, LLC, and FARREL CROWDER,

Defendants.

------------------------------------------------------------

**REPORTER'S PARTIAL TRANSCRIPT**
**TESTIMONY OF FARREL CROWDER**
(Bench Trial)

------------------------------------------------------------

Proceedings before the HONORABLE SCOTT T. VARHOLAK,

Magistrate Judge, United States District Court for the

District of Colorado, on the 26th day of February, 2024, in

Courtroom A402, United States Courthouse, Denver, Colorado.

**APPEARANCES**

JOSHUA J. SANFORD and SEAN SHORT, Sanford Law Firm,
PLLC, 10800 Financial Centre Parkway, Kirkpatrick Plaza,
Suite 510, Little Rock, Arkansas 72211, appearing for the
plaintiffs.

MICHAEL J. DAVIS, Davis Murry Law, LLC, 2255 Sheridan
Boulevard, Suite C272, Edgewater, Colorado 80214, appearing
for the defendants.

**MARY J. GEORGE, FCRR, CRR, RMR**
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

1

2                    P R O C E E D I N G S

3        (This is a transcript of the testimony only)

4                  *       *       *       *       *

5              MR. SANFORD:  Yes, Your Honor.  Plaintiffs call

6        Farrel Crowder.

7              COURTROOM DEPUTY:  Raise your right hand, please,

8        sir.

9              FARREL CROWDER, PLAINTIFFS' WITNESS, SWORN

10             COURTROOM DEPUTY:  If you would have a seat, sir,

11       and state and spell your name for the record, please.

12             THE WITNESS:  What was that?

13             COURTROOM DEPUTY:  State and spell your name for

14       the record.

15             THE WITNESS:  I'm sorry.  Farrel Crowder,

16       F-a-r-r-e-l, C-r-o-w-d-e-r.

17             THE COURT:  Go ahead.

18                     DIRECT EXAMINATION

19       BY MR. SANFORD:

20       Q.   Mr. Crowder, Defendant TJ Crowder and Sons, LLC, is a

21       Colorado limited liability company doing business as

22       Humalfa, correct?

23       A.   That's right.

24       Q.   Okay.  You are a resident of the state of Colorado.

25       A.   Yeah.

1    Q.    Within the three years preceding the filing of this

2    lawsuit, Humalfa operated a composting company that converts

3    raw cattle manure into organic fertilizer?

4    A.    Yeah, basically.  Yeah.

5    Q.    Okay.  Your role at TJ Crowder and Sons, LLC, is not

6    just that of an owner, but you are also the manager of it.

7    A.    That's correct.

8    Q.    Would you call yourself a principal or officer or

9    director or anything like that?

10   A.    Well, I'm a managing member.  My brother's in business

11   with me and he's a member, but I'm the managing member.

12   Q.    Okay.  You run the day-to-day operations.

13   A.    Of Humalfa, yes.

14   Q.    Okay.  Thank you.  Part of those day-to-day operations

15   are that ultimately hiring and firing people is your call.

16   A.    That's right.

17   Q.    And in the specific case here, you have hired

18   Mr. Porter before.

19   A.    Uhm-hum.  Yes.

20   Q.    Did you hire him twice?

21   A.    I -- yeah, I did.

22   Q.    Okay.  And you have hired Ms. Porter before, correct?

23   A.    At the tail end of the -- of Chris' employment, yes,

24   she was hired to drive a truck.

25   Q.    Okay.  Well, but you spoke in the passive voice.  I

1   think what you mean is "I hired her to drive a truck."

2   A.   Yes.

3   Q.   Okay.  You were responsible for -- ultimately for

4   setting their wages and their hours of work, correct?

5   A.   Yes.

6   Q.   You are the person inside the business who has ultimate

7   responsibility for maintaining the employment records,

8   correct?

9   A.   Yes.

10  Q.   Okay.  Humalfa, during 2019 through '22, always in --

11  always employed at least two employees, correct?

12  A.   At least two, yes.

13  Q.   Yes?

14  A.   Yes.

15  Q.   And in fact, many more than that, correct?

16  A.   Yeah.

17  Q.   Approximately how many average employees would you have

18  during --

19  A.   Oh, usually around eight.

20  Q.   Okay.  And you're not contesting, I take it, that you

21  are a business that is regulated under the Fair Labor

22  Standards Act.

23  A.   Yeah, I'm sure we --

24       MR. DAVIS:  Objection.  Calls for a legal

25  conclusion.

1    BY MR. SANFORD:

2    Q.    Do you know --

3          THE COURT:   Overruled.   His -- the company's

4    subjective knowledge may be relevant at some point so

5    overruled.

6    BY MR. SANFORD:

7    Q.    In your role as the managing member did you endeavor to

8    comply with federal employment law?

9    A.    Yes.

10   Q.    In your role as managing member, did you endeavor to

11   apply with Colorado employment law including the Colorado

12   Wage Act?

13   A.    Yes, sure we did.

14   Q.    Okay.   What is your employment -- your educational

15   background.

16   A.    I have just a little college.

17   Q.    Okay.   Mr. Porter was employed by Crowder starting in

18   2007, correct?

19   A.    I suppose.

20   Q.    And you hired him.

21   A.    Yes.

22   Q.    Then there was a time in 2019 when he did not work.

23   Right?

24   A.    Yes, I guess there was.

25   Q.    And was that in connection with some legal trouble that

1    he had?

2    A.    I believe so.

3    Q.    Was it more than a DUI?

4    A.    All I know is it was a DUI, and maybe some domestic

5    violence.

6    Q.    Okay.  After that period of 2019, you brought him back

7    to Humalfa for roughly at least the last 11 weeks of that

8    year, correct?

9    A.    Yes.  Whatever those records show.

10   Q.    Okay.  When he was hired on in 2007 when he was a truck

11   driver?

12   A.    I believe he was doing the same thing.  I think he was

13   hauling manure out of the pens out to the compost yard.

14   Q.    And that job title is called production manager?

15   A.    Well, just truck driver.

16   Q.    Okay.  But at the end of his employment, he was called

17   a production manager, correct?

18   A.    Yes.

19   Q.    Okay.  At what point did you give him a new title?

20   A.    Oh, I don't know.  I guess that -- when he come back to

21   work and was working there out of Yuma.

22   Q.    Okay.  Now the place where he worked -- and I just want

23   to focus on the post -- the final 2 1/2 years of his

24   employment, meaning not prior to his legal trouble, but when

25   he came back and you brought him back, was that all at -- in

1   Yuma?

2   A.   Yes.

3   Q.   Okay.  And that was at a feedlot, correct?

4   A.   That's right.

5   Q.   Was that the same feedlot the whole time?

6   A.   Uhm-hum.  Yes.

7   Q.   And who owned that feedlot?  What was the name of it?

8   A.   Five Rivers Cattle Feeding.

9   Q.   Okay.  And I think when we go through the text messages

10  between Heather Day and BreeAnna Porter, we'll see a

11  document from Five Rivers, if you've looked at that.  Is

12  that right?

13  A.   Possibly.  I never noticed it, but yes.

14  Q.   Okay.  Are you an owner of the Five Rivers entity?

15  A.   No.

16  Q.   Do you have any ownership interest in either their

17  operations or their real estate?

18  A.   No.

19  Q.   In actual fact, Humalfa is a vendor of Humalfa's

20  services and product to Five Rivers, correct?

21  A.   Yeah.

22  Q.   You basically set up shop on their property and you

23  take their cattle manure and, through your process, enrich

24  it and make it more valuable and useful for them, correct?

25  A.   Yes.  And the reason we -- we turn this manure, compost

1    it, on the feedyard within their CFO permit, Confined Animal

2    Feeding Operation, within their drainage permit so we don't

3    have to dig lagoons or -- you know what I mean.

4    Q.    Yes.

5    A.    And that keeps us exempt as far as the State's

6    concerned.  We don't have to -- if we went off of the

7    feedyard or out of that CFO permitted area, then the

8    Colorado Health Department would regulate us.  Staying

9    within their CFO permit, we -- or what they call ag exempt,

10    and we're regulated by the Department of Agriculture.

11    Q.    And I take it that what you're saying is that there are

12    agricultural regulations which don't apply to you because

13    you're able to provide the service on-site for your

14    customers.

15    A.    That's right.

16    Q.    And it's also your belief that because you don't come

17    under the agricultural jurisdiction or regulation, because

18    of that, that you believe that you also don't come -- that

19    you are within the agricultural exemption for the work that

20    the Porters did.

21    A.    Yes.

22    Q.    Okay.  But it's true --

23    A.    We've been doing this for years and it's kind of common

24    knowledge.  You don't get more ag than dealing with cattle

25    manure; that's about as ag as it gets.

1   Q.   But I'm right when I say that prior to 2019, you didn't

2   go to an attorney and seek an opinion telling you whether or

3   not you owed overtime to Mr. and Mrs. Porter.

4   A.   An attorney wrote up our employee handbook.

5   Q.   I get that.  And -- we're going to get to that document

6   in a minute.  But I'm right that you -- no -- you didn't

7   seek an opinion from an attorney about the actual work that

8   the Porters were doing as it relates to overtime law.

9   A.   No, I didn't.  Just on them specifically, no.

10  Q.   My understanding -- and you correct me if I'm wrong --

11  is that you -- you told the lawyer who wrote up the

12  employment handbook that, "We are ag exempt because of the

13  way that we do the production on-site."

14  A.   Well, yeah, the lawyer kind of told me that.

15  Q.   Okay.  And what was the name of that lawyer?

16  A.   Levi Williamson.

17  Q.   And is he an employment lawyer?

18  A.   I don't -- I don't think -- I think just general

19  lawyer.

20  Q.   Okay.  Did Mr. -- did you pay Mr. Williamson to go

21  on-site at either the Yuma location --

22  A.   Yeah, he was on-site with me.

23  Q.   And did you show him the work that the Porters were

24  doing?

25  A.   I showed him work like that.

1   Q.    Okay.   Okay.   And did you communicate anything about

2   the ownership of the underlying real estate there on -- for

3   the feedlots?

4   A.    He would have known that.   He knew we didn't own it.

5   Q.    Okay.   Ms. Porter's title was manure handler.

6   A.    Yes.

7   Q.    Prior to Mr. Porter's title being changed to production

8   manager, he was a manure handler?

9   A.    What?

10  Q.    Prior to Mr. Porter being retitled production manager,

11  he was a manure handler.

12  A.    That's right.

13  Q.    Okay.   Is it a fair assessment of Mr. Porter's duties

14  to say that he was overseeing the composting of fertilizer

15  and assigning other employees to tasks surrounding that

16  activity when he was the production manager?

17  A.    No, not so much.   I mean, his -- his duties was getting

18  manure out of the pens -- the feedlot piles of manure in --

19  these piles in the pens, and his duties was hauling that

20  manure from the pens out here to the yard -- compost yard.

21  Q.    So even when he was a production manager, he still is

22  moving a lot of manure.

23  A.    That's what he was needing -- that's what we needed him

24  to do.   And I have another guy that did the turning, so he

25  didn't have anything to do with that.

1    Q.    And that work is time sensitive.

2    A.    The turning, yeah.

3    Q.    No, I'm sorry, no, the moving of the manure from the

4    feedlot.

5    A.    Yes.

6    Q.    And the reason it's time sensitive is if you don't get

7    it out of there, the cattle can't ingress and egress; they

8    can't move around.

9    A.    That's right.  The feedyard don't like it in there.

10   Q.    Right.  And because of that, it's the type of work

11   where you don't just work five days a week.  As long as the

12   cattle are in there pooping, you got to deal with it.

13   A.    Well, pretty much.  But now we can't -- when it's wet,

14   when we get rain or snow or anything, it takes those pens

15   quite a while to dry out.  You know, we don't get in there

16   and slop around.  So, you know, bad weather will sure shut

17   us down.

18   Q.    Right.  You're trying to make the facilities better for

19   the farmer, not worse?

20   A.    Oh, absolutely.

21   Q.    Okay.  Did you come to court with a record of times --

22   like a written record of any kind that -- that the owner of

23   the Yuma facility was complaining that Mr. Porter wasn't

24   getting the manure out fast enough?

25   A.    I -- I never brought anything paperwise, no.

1    Q.    Okay.  Are you going to tell some verbal testimony

2    about that?

3    A.    Well, just that there -- towards the latter end of his

4    employment, we -- the yard was empty and there's lot of

5    manure to haul, and, yes, the man that I work with there in

6    the feedyard was telling me that we need to get -- we need

7    to get busy and get something done here.

8    Q.    And this was February of '22.

9    A.    Yes.  Or January or February.

10   Q.    Okay.  It was at some point early '22, right?

11   A.    Excuse me?

12   Q.    It was at some point in the early part of 2022.

13   A.    Yes, probably.

14   Q.    And this was a departure from how things had been for

15   years, because Mr. Porter had been there removing the manure

16   for years, correct?

17   A.    For quite a while.  I thought we hired him in 2019 --

18   2018.

19   Q.    Okay.  Well, hired him twice, though, right?

20   A.    Well, I get -- he did help us for a while back early.

21   I don't remember, you know, 2007 you said earlier.  I

22   don't -- I remember him helping us back then for a while,

23   but I don't know how long.

24   Q.    You started Humalfa in 2006 roughly?

25   A.    Yeah.

1    Q.    He was one of your early helpers.

2    A.    He did help us.  His dad run the turner for me.

3    Q.    Oh, okay.  Is that how he got the job?

4    A.    Yes.

5    Q.    Okay.  You don't own -- and by "you" I mean neither you

6    personally nor the entity, Crowder and Sons, you don't own

7    the cattle feedlots or the cattle where the manure's being

8    processed.

9    A.    That's true.

10   Q.    Do you in any legal way own the manure at any time?

11   A.    As soon as we pick it up in the pens, load it on our

12   truck, it's our manure.

13   Q.    And you can do whatever you want with it.

14   A.    Yes.

15   Q.    Okay.  And are you paying the farmer for it?

16   A.    Not now.  At times we have had to pay a couple of

17   feedyards for it but no, we're not now.

18   Q.    Okay.

19   A.    Or then.

20   Q.    And once you pick it up, you own it.

21   A.    Yes.

22   Q.    And -- and your operation is a separate operation from

23   the feedlot, itself.

24   A.    Yes.

25   Q.    Okay.  Do you sign written contracts with the cattle

1   ranchers and feedlots to provide services to them?

2   A.   It's all verbal.

3   Q.   It's all verbal.  But once you get a verbal agreement

4   with them, you tend to serve them for years.

5   A.   Yeah, we've been in these feedyards for a long time.

6   Q.   Okay.  I -- I take it from that that your customers are

7   pretty happy with the product.

8   A.   Yeah.  Yeah.

9   Q.   It helps -- it helps solve two problems for them,

10  right?  They need the manure out and they like to have the

11  fertilizer on the pastures.

12  A.   That's right.

13  Q.   Okay.  You don't have any sort of association or

14  affiliation with the cattle-farming operation except the

15  verbal agreement to do the manure contracting.

16  A.   That's right.

17  Q.   I'm going to oversimplify it, but you tell me if you

18  can agree with this:  The manure was converted into

19  fertilizer by moving the manure into windrows and turning or

20  flipping the rows weekly over the course of roughly eight

21  weeks until the manure was full and loamy.

22  A.   The manure -- you know, raw manure is spread all the

23  time as fertilizer.  So manure is fertilizer to start with;

24  it's not that we're turning it into fertilizer.

25  Q.   Right.

15

1   A.    It already is fertilizer.

2   Q.    Your --

3   A.    By turning it and composting it, it allows that

4   resource to be shipped a lot further.  Raw manure, you can

5   just afford to haul it 10, 15 mile from the source here.

6   But once you have composted it, that ton of compost will

7   replace about 6 ton of manure.

8   Q.    Okay.

9   A.    So it lets that resource -- you have -- our average

10  haul out there is 30, 40 miles from the feedyard, so we're

11  spreading that resource out a lot further.

12  Q.    And you're doing that not -- you're spreading that out

13  not just on the pastures owned by the feedlot or that

14  rancher, but on your other customers.

15  A.    Yeah.  On their fields, yeah.

16  Q.    Hold on.  Who's the "their"?  Because I'm saying

17  there's two groups of people.  There's the --

18  A.    Well, the --

19  Q.    Pardon?

20  A.    It will be other farmers.

21  Q.    I'm going to say a statement to try to clear that up.

22  You tell me if you agree with it.  Much of the composted

23  manure goes to fields, is applied to pasture lands not owned

24  by the rancher or feedlot who produced the manure.

25  A.    That's correct.

16

1   Q.   Okay.  And roughly speaking, it is laid out into

2   windrows and flipped for a period of roughly eight weeks

3   while it undergoes this biological and chemical

4   transformation to become more valuable.

5   A.   Yes.

6   Q.   Okay.  Once it finishes that eight-week process, your

7   team would collect it to resell it.

8   A.   Uhm-hum.

9   Q.   Yes?

10  A.   Yes.

11  Q.   Okay.  Both plaintiffs, when they were on payroll with

12  you, were paid an hourly wage.

13  A.   That's correct.

14  Q.   Their -- their hours were simply not the same from week

15  to week, correct?

16  A.   Yeah.  I'm sure they wasn't.

17  Q.   It wasn't a situation where they work 8:00 to 5:00

18  every single day like that, right?

19  A.   No.

20  Q.   Okay.  During the course of discovery in this case, the

21  exchange of information between the parties, you have

22  provided a series of text messages, a conversation of text

23  messages, through your lawyer between Heather Day and

24  BreeAnna Porter; is that right?

25  A.   Yes.

1    Q.    And you've reviewed -- you have reviewed that thread.

2    A.    I have what?

3    Q.    You've reviewed it; you've read your way through it?

4    A.    I read it, yeah.

5    Q.    Okay.  To your knowledge, it -- it's intended to be an

6    accurate representation of the text conversation that they

7    had.

8    A.    Apparently, yeah.

9    Q.    Okay.  You don't believe it to have key text messages

10   deleted out of it or anything like that.

11   A.    Not that I know of.

12   Q.    Okay.  When Ms. Day received the text messages from

13   Ms. Porter, that was her primary source of knowing how many

14   hours were worked in Yuma, right?

15   A.    That's right.

16   Q.    And to your understanding she would then take those

17   hours that come in through text messages and put them into a

18   database.

19   A.    Yes.

20   Q.    Was that QuickBooks?

21   A.    Yes.

22   Q.    Okay.  Was there any other accounting software or

23   payroll software other than QuickBooks, to your knowledge,

24   that was in play during 2019 to 2022?

25   A.    Well, we did have that -- I don't know what you call

1   it -- but it was a little box there that you could phone in

2   and turn your hours in over the phone into this little box.

3   Q.   Like a little computer device?

4   A.   Yeah.

5   Q.   And that was connected to your computer system?

6   A.   I can't think of what we called it, but yeah, it was --

7   yeah, connected to her computer.

8   Q.   And was it deployed out to the workers through an app

9   on their phones?

10  A.   Yeah.

11  Q.   But it didn't work very well.

12  A.   It was a hit-and-miss deal, that's right.

13  Q.   Okay.  So even if we got those app records or that --

14  that box records, you would say it's not going to have

15  perfect records.

16  A.   I would.

17  Q.   Okay.  You've also read the text thread between

18  Ms. Porter and Ms. Day closely enough to know those aren't

19  perfect records either.

20  A.   That's right.

21  Q.   And as we stand here today, no one, not on your side of

22  the courtroom or on my side of the courtroom, can say

23  exactly how many hours each person worked in any particular

24  week.

25  A.   Well, we would know what we paid them for each week.

1    Q.    So do you have records here at the trial of how much

2    money you paid either person in each week?

3    A.    I don't have the records up here.

4    Q.    Okay.  What we do have is year-end summaries, right?

5    A.    Yeah.

6    Q.    Okay.  And to your knowledge, those year-end summaries

7    are the best information that you have of how many total

8    hours each person worked.

9    A.    That's right.

10   Q.    But those summaries don't say how many hours they

11   worked in any particular week.

12   A.    That's right.  Summaries don't.

13   Q.    And you and I know that because of the nature of the

14   work, that the hours varied sometimes dramatically from week

15   to week.

16   A.    At times it will vary.

17   Q.    It wouldn't surprise you if Mr. Porter turned in a week

18   where he worked hours under 40 sometimes.

19   A.    Under 40, yeah.

20   Q.    That would surprise you or wouldn't?

21   A.    It wouldn't.

22   Q.    Okay.  Also up around 70 wouldn't surprise you.

23   A.    Probably not.

24   Q.    And in that 50 to 60 range is really kind of a sweet

25   spot where you would expect him to be unless there was a

1    holiday.

2    A.    Yes, probably in that 40 to 50 hours.

3    Q.    So you say closer to 40 to 50?

4    A.    Yes.

5    Q.    Not 50 to 60?

6    A.    Yes.

7    Q.    Okay.  Is -- is 50 the number that's fairly close?

8    A.    Well, that's what I would think, yes.

9    Q.    Okay.  Does the handbook say that, "We, Crowder and

10   Sons, will deduct an hour from your payroll time if you

11   don't deduct it from your own time"?

12   A.    For lunch?

13   Q.    Yes.

14   A.    We deducted 30 minutes.

15   Q.    So you're saying here today under oath that you

16   deducted 30 minutes.

17   A.    Yeah.

18   Q.    And you -- if -- if we read the employee handbook and

19   it says you deduct an hour, your --

20   A.    It shouldn't say that.  Anyway, we deduct 30 minutes.

21   Q.    I've got to finish my question, though.  If it says,

22   "We deduct an hour," you're saying that record is not

23   correct.

24   A.    We changed it somewhere along the way; that's right.

25   Q.    You used to deduct an hour for lunch.

1    A.    Yes.

2    Q.    And when -- what was the date that you --

3    A.    I don't know, but it has been years ago because we've

4    been 30 minutes for many years.

5    Q.    Many years mean prior to November of 2019?

6    A.    Yes.   I mean, back in -- I started this Humalfa deal in

7    '06, so -- and it was, I'm going to say, probably in 2010 or

8    something when we went to 30-minute lunch.

9    Q.    Okay.   And if the employee handbook is dated 2011, and

10   then renewed again in 2022, and it still says an hour,

11   you're going to tell the Court, "Please ignore that and

12   trust me, it was 30 minutes"?

13   A.    It's 30 minutes.

14   Q.    But you didn't bring any records, that show it was 30

15   minutes, to this trial.

16   A.    No, I didn't.

17   Q.    Okay.   But your QuickBooks report, the week by week by

18   week by week, would show that, correct?

19   A.    I suppose.

20   Q.    Okay.   Is it true that there were sometimes after-hours

21   emergencies for events or problems that Mr. Porter had to go

22   back to the feedlot at Yuma and deal with?

23   A.    Maybe once in a great while, but that wasn't very

24   often.

25   Q.    Okay.   And just so we're clear, once in a great while

1  means how frequently?

2  A.   Oh, a time or two in a year.

3  Q.   Ms. Porter was on the payroll back in 2019, correct?

4  A.   I guess so, for a little while.

5  Q.   Okay.  And then she was off the payroll until late in

6  2021, correct?

7  A.   I think so.

8  Q.   During her period of not being on the payroll -- I

9  guess you know now that she says that she was doing some

10  work for you guys.

11  A.   Well, you need to understand this:  Chris didn't have a

12  driver's license the whole time he worked for me, so Bree

13  had to always drive him around, drive him to work and all.

14  Well, instead of her just dropping him off at work she would

15  hang around there with him.  And that's my mistake, I should

16  have not let that happen; should have told her to go home.

17  But I didn't.  And so she was around there.  And, yeah, and

18  Chris would have her do this and she would do this.  I don't

19  know what she did.  She was not on the payroll and I didn't

20  hire her.  But the fact that she dropped him off and stuck

21  around with him, you know, that's on them.

22  Q.   From time to time, you would come by and visit the

23  feedlot at Yuma.

24  A.   Oh, yeah.

25  Q.   Ms. Porter's, I think, going to testify that you would

1    sometimes give her a little bit of cash, maybe $100.

2    A.    She'd clean the cabs of the loaders and trucks and

3    stuff and, yeah, there's times -- several times I give her

4    $100 bill.

5    Q.    I know you all are at odds right now, but back in the

6    day, there wasn't as much animosity between you two,

7    correct?

8    A.    No, that's right.

9    Q.    Okay.

10    A.    I always wanted to be fair.  I always believe I am

11    fair.

12    Q.    I --

13    A.    In fact, more than fair.

14    Q.    All right.  Is it fair to say that you understood that

15    Mr. Porter was consistently working -- and by "consistently"

16    I don't mean always -- but consistently working over 40

17    hours a week?

18    A.    Who's this?  Which one?

19    Q.    Mr. Porter.

20    A.    Was consistently working over 40 hours a week?  I don't

21    know that it was consistently, but he sure did some.

22    Q.    Okay.  Well, your own records show that he worked over

23    2800 hours in 2021, right?

24    A.    Okay.

25    Q.    So knowing that, would you agree with me that he very

1   often worked -- I don't mean always, but very often worked

2   more than 40 hours a week?

3   A.   Yes.

4   Q.   And that was at the time no concern of yours because

5   you were paying him straight time for all hours worked,

6   because you believed him to be exempt under the agricultural

7   exemption.

8   A.   That's right.

9   Q.   Okay.

10  A.   Well -- and if I would have -- if I knew I was going to

11  have to pay time and a half, I would have shut his hours off

12  at 40 hours.  I would have hired me another guy.

13  Q.   Okay.  And --

14  A.   So it was kind of the benefit of him and me not having

15  to have another employee, but he could get some extra time

16  if he wanted it.

17  Q.   Okay.  But it did benefit you financially that you

18  weren't paying him an -- a time and a half premium.

19  A.   Yes.  I guess it would be -- benefit me, but I -- like

20  I say, I wouldn't have been paying time and a half anyway.

21  Q.   And you knew that you were not paying him time and a

22  half.

23  A.   Oh, yeah, I knew that.

24  Q.   Okay.  And you knew that he was generally -- not

25  always, but generally working over 40 hours.

1    A.   Yes.

2    Q.   Hey, let me ask you a question.  We're going to get

3    into these text messages in a little bit, I know it's really

4    not your purview, but there are like weeks and weeks where

5    there's no text messages.  Like at least not in the thread.

6    A.   I noticed that myself.

7    Q.   Yeah.  So how -- how did Mr. Porter get paid?  I mean,

8    what was the plan?

9    A.   Well, they was giving the hours to Heather.  I don't

10   know whether they -- if they didn't text them, I'm sure they

11   called them in.

12   Q.   Okay.  Could have been just a phone call.

13   A.   Yeah.

14   Q.   And the -- the QuickBooks database, that would have

15   Heather's version, her input, of whatever -- whatever she

16   received from the Porters.

17   A.   That's right.

18   Q.   Minus the 30 minutes, as you say, for lunch.

19   A.   Yes.

20   Q.   Okay.  Is it true that you were not providing paid

21   10-minute breaks every four hours to Mr. Porter while he was

22   working?

23   A.   No, I would -- if they was taking a break, yeah, it was

24   all paid.  10-minute breaks.

25   Q.   Okay.

1   A.   I wasn't forcing a break on them.  I didn't say,

2   "You've got to take a break here," but they was getting

3   their breaks, you know.

4   Q.   How do you know that?  It sounds like you weren't there

5   very often.

6   A.   Well, I'm just very confident that they was getting

7   their breaks.  And, you know, they was paid -- the only

8   thing we deducted was 30 minutes for lunch.

9   Q.   Okay.

10   A.   So it was up to them.  I didn't micromanage them.

11   Q.   Does the handbook explain to the employees that they

12   are to take compensated breaks of 10 minutes every four

13   hours or the better part --

14   A.   I believe it does.

15   Q.   Or the better part of every four hours?  Yes?

16   A.   Yes, I believe so.

17   Q.   Okay.  Did you ever ask any of your employees to log

18   that time?

19   A.   No.

20   Q.   Okay.  Is there any other steps that you took to comply

21   with the FLSA or the Colorado Wage Act that you would like

22   to tell the Court about right now?

23   A.   Not that I know of.

24   Q.   Okay.  Did you know, starting at least in 2019, that if

25   you -- if your business was not qualified under the

1   agricultural exemption, that you would have had to pay an

2   overtime premium to the Porters?

3   A.   Did I know that?

4   Q.   Yeah.

5   A.   Yes.

6   Q.   The agricultural exemption was the only reason that you

7   were not paying a premium on hours over 40, correct?

8   A.   That's right.

9        MR. SANFORD:   Your Honor, may I have one moment?

10        THE COURT:   Sure.

11        MR. SANFORD:   Pass the witness, Your Honor.

12        THE COURT:   Okay.   I know it's not technically

13   cross-examination but for lack of a better term, cross.

14        MR. DAVIS:   Your Honor, we kind of talked about

15   this at the pretrial conference where I can both do the

16   direct and the cross at the same time.

17        THE COURT:   Okay.

18                  CROSS-EXAMINATION

19   BY MR. DAVIS:

20   Q.   I want to go over a couple of points that counsel asked

21   you about.   He said that -- when he was asking about the

22   10-minute breaks, you said that they were getting their

23   breaks.   That you were confident that they were getting

24   their breaks.   Why were you confident?

25   A.   Well, I've worked enough men to know that they -- they

1   take a break when they need one, you know.

2   Q.    Uhm-hum.  Did that have anything to do with the fact

3   that BreeAnna was taking him to the -- the site and just

4   being with him?

5   A.    Taking him where?

6   Q.    Taking him to the feedlot.

7   A.    Well, yes.  I mean, that's -- they -- for some reason,

8   Chris can't get very far away from Bree, and so he -- that's

9   why he was terminated because he wasn't turning his hours in

10  correct and he was getting to work for just week after week

11  at 9:00, 9:30, 10:00.

12  Q.    Uhm-hum.

13  A.    And he -- I asked him one time, I says, "You know,

14  Chris, why don't" -- because he would give me the reason

15  that he had to get his daughter to school.  I says, "But you

16  don't drive, so why don't BreeAnna take the daughter to

17  school and you get dropped off there at 7:00 and go to work

18  like you're supposed to?"

19         "Oh, no, I got to take my daughter to work -- or to

20  school."

21         So then he would get to work at 9:00 or 9:30,

22  whatever, but turn in his hours at 6:00, 6:30, that he

23  started.

24  Q.    Was that a consistent pattern that --

25  A.    Very consistent.

1  Q.   -- he followed --

2  A.   The latter several months.

3         MR. DAVIS:  Excuse me for one second, Your Honor.

4  BY MR. DAVIS:

5  Q.   And was this a consistent pattern during the time that

6  Chris Porter worked?

7  A.   It was at the latter part of his employment, yes.

8  Q.   Okay.  Did you know what the pattern was at the

9  beginning of his employment?

10  A.   Well, it seemed, by the way I remember it, he did a lot

11  better.

12  Q.   Okay.

13  A.   You know, around the feedyard, you -- everybody goes to

14  work about 6:00 or 7:00 and so we kind of needed to be the

15  same way.

16  Q.   And you indicated that he was getting to work at 9:30?

17  A.   Yes.

18  Q.   Okay.  I want you to pick up the black book in front of

19  you.

20  A.   Which one?  The defendants?

21  Q.   The book -- is -- what color is the other one?

22         COURTROOM DEPUTY:  They're both black.

23         MR. DAVIS:  Oh, they're both black.  Okay.  I

24  thought I saw a blue one wandering around.

25  BY MR. DAVIS:

1    Q.    Defendants.  I want you to turn to Exhibit C.

2    A.    Okay.

3    Q.    And I want you to turn to page 2 of Exhibit C.

4    A.    I'm there.

5    Q.    Okay.  Do you know what this is?

6    A.    Yeah, it's a warning.

7    Q.    And who gave it to Mr. Porter?

8    A.    KC Scott.

9    Q.    And what does it say?

10   A.    "Neglecting to inform supervisors of tardyness prior to

11   morning.  Very often."

12   Q.    And is it signed by Mr. Porter?

13   A.    No, he wouldn't sign it apparently.

14   Q.    So was he terminated after this?

15   A.    No, not after this one.  No.

16   Q.    Okay.  Did he work in 2018?

17   A.    Yes.

18   Q.    Okay.  I want you to turn to Exhibit E, and let's go to

19   page 7.

20   A.    Okay.

21   Q.    So this is the -- do you recognize this?

22   A.    Yes.  Yeah, it's a summary of his hours for 2018.

23   Q.    Okay.  When we were asked by the plaintiffs for -- for

24   records -- for payroll records, this is what was turned

25   over; is that correct?

1    A.    Yes.

2    Q.    Did they ever ask for anything else besides this?

3    A.    Not that I'm aware of.

4    Q.    And -- and did -- did you have discussions with Heather

5    about the fact that you had weekly payroll records?

6    A.    I never did have that discussion with her, but I know

7    we do.

8    Q.    Okay.  But -- but it was never asked for by plaintiff.

9    A.    Not -- well, you would have been the one to ask for it,

10   and no.

11   Q.    Okay.  So the fact that they're saying that you didn't

12   turn it over, would you have turned it over if they had

13   asked for it?

14   A.    Absolutely, yeah.

15   Q.    And you have the records -- those are part of your

16   normal records that you keep.

17   A.    Yes.  Yes, we have the records.

18   Q.    All right.  In -- in plantiffs' counsel opening

19   statement, he made -- made it sound like you and the Porters

20   had a very close relationship.

21   A.    Back early -- I always -- his dad worked for me and,

22   you know, Chris was a good guy, but he just was lazy and he

23   had to stay too close to Bree.  He -- but back early, yes,

24   we had a pretty good relationship.

25   Q.    And --

1    A.    I know I helped him out quite a little several

2    different times.

3    Q.    How did you do that?

4    A.    Well, by fronting him money to pay his fines and giving

5    him time off to do his community service and things like

6    that.

7    Q.    Yeah.  And who was it that was in charge of keeping the

8    records for the amount of time that Chris Porter worked?

9    A.    Well, Heather.

10   Q.    No, who turned in the hours?

11   A.    Well, most of the time Bree.  And I don't know why that

12   was.  I mean, I don't know why Chris wasn't turning in his

13   own hours.

14   Q.    And was -- was Bree also turning in her own hours?

15   A.    Yes.

16   Q.    And --

17   A.    When she was working, yeah.

18   Q.    And if they turned hours in, were they paid for those

19   hours?

20   A.    They were.  Every time.

21   Q.    And you indicated that -- that you paid them for the

22   hours they worked.

23   A.    That's right.

24   Q.    And you always paid them for the hours they worked.

25   A.    That's correct.

1   Q.   And because you weren't paying overtime, you let them

2   work those extra hours?

3   A.   That's right.

4   Q.   So it was to -- it was to the Porters' -- wasn't it to

5   the Porters' advantage that you let them work those extra

6   hours?

7   A.   Well, it would seem to me that way, yes.

8   Q.   Okay.  I want to talk about Five Rivers.  Actually,

9   let's -- let's do something else here.  Because what I want

10  to do is -- is really paint the picture of -- of how these

11  feedlots work and how you interact with them.  Okay?  Tell

12  us exactly how a feedlot works.

13  A.   Well, they -- you know, they just -- like the Yuma

14  yards where Chris was at, that at one time -- I think it

15  still is the biggest feedyard in the country.  And they have

16  pen space for 125,000 head.  They generally keep around 85-

17  to 100,000 head in there.

18       Those cattle are making manure every day and the

19  feedyard cleans up the pens.  We don't clean pens.

20  Q.   When you say -- when you say "they clean their own

21  pens," what do you mean?

22  A.   Well, they scrape the pens, scrape the manure off.

23  Q.   Okay.

24  A.   You know, just good animal husbandry practices.  You

25  know, you keep a clean environment for them cattle to be fed

1    in, they feed a lot better.  And so they pile this manure,

2    and that's where we come in and we load the piles and haul

3    them out to the compost yard.

4    Q.    Okay.  How far is it from -- well, first of all, how

5    big is this feedlot?

6    A.    The feedyard is on 900 and a few acres.  I don't

7    remember exactly.  But that's how big it is.  It's about a

8    section and a half of ground.

9    Q.    And do you know how -- in miles how much that is?

10   A.    Well, from one end to the other it's a mile long.

11   Q.    So is it a mile square; is that fair to say?

12   A.    Pretty much, yeah.

13   Q.    And what was Chris' job?

14   A.    Well, hauling that manure.  Loading it on trucks and

15   hauling it from the pens on out to the yard.

16   Q.    And was the yard located on the farm or in the feedlot?

17   A.    At that particular yard, we have two compost yards on

18   the north side and one nice one on the south side.

19   Q.    And after -- so -- so Chris would -- so was it Chris'

20   duty -- so what was Chris' duty in terms of the part where

21   the -- strike that.  The -- once the manure was hauled to --

22   what's that -- what section do you call the --

23   A.    The compost yard.

24   Q.    The compost yard.  What would you do with the

25   compost -- what would you do with the manure when it was in

1    the compost yard?

2    A.    Well, they would dump it in windrows, you know, just

3    rows that are about 16-foot wide at the bottom and they're

4    6 -- 6-foot tall.

5    Q.    And how would they do that?

6    A.    Just with the dump trucks.

7    Q.    Uh-huh.  Would that be Chris' job?

8    A.    Yeah.

9    Q.    Okay.

10   A.    And then they would have to dress them up a little bit

11   to -- you know, the edges, and then we'd turn them with the

12   turner.

13   Q.    How big is the turner?

14   A.    It would straddle those rows.  You know, it would

15   straddle an 18-foot row.

16   Q.    Did you keep a turner in each one of the feedlots?

17   A.    No, the turner traveled.  We just had one turner.

18   Q.    How often would a turner stay at a feedlot?

19   A.    Well, we would try to get through there every couple of

20   weeks; two to three weeks.

21   Q.    Was it important to have the manure moved from the --

22   from the feed part to the compost part?

23   A.    Yes.

24   Q.    And -- and what would be the result if it wasn't

25   moved?

1   A.    We wouldn't have much to turn.  We wouldn't -- we

2   wouldn't be making product.

3   Q.    Yeah.  Now, I know that counsel asked this, but you

4   don't own the feedlot.

5   A.    No.

6   Q.    And you don't own the -- the compost part of the lot.

7   A.    Not the land, no.

8   Q.    And do --

9   A.    Now we did spend the money -- Humalfa spent the money

10   to make the compost yard, you know, level them out, put a

11   little bit of drop to them.  That was all our money that did

12   that.

13   Q.    Okay.  And do you -- and does the -- we're talking

14   about the Yuma yard.  Do they do anything besides run that

15   feedlot?

16   A.    You mean Five Rivers?

17   Q.    Yeah.

18   A.    Yeah, that's all they do is run that feedyard.  Well,

19   they have other feedyards.

20   Q.    Okay.  But they don't -- they don't raise corn?

21   A.    No.

22   Q.    They don't raise crops?

23   A.    They feed cattle.

24   Q.    That is the only thing that they do.

25   A.    That's right.

1    Q.   And how long do the cattle stay in there?

2    A.   Generally speaking, you'll -- you'll finish 2 1/2

3    rounds of cattle a year.  So, you know, 150 days, 140 days

4    per cycle.

5    Q.   Okay.  So after you process the manure, is it still

6    manure?

7    A.   Still manure.

8    Q.   You don't put anything in it.

9    A.   Nothing in it.

10   Q.   You don't add -- do you add anything to the manure?

11   A.   No.

12   Q.   So all you do is just turn the manure?

13   A.   Just turn the manure.  Break it up -- it does become a

14   nicer looking product.  It's -- it's fine, you know.  It

15   breaks it up and looks better.

16   Q.   Is there a -- is there a benefit -- is there any

17   benefit to the farm from turning the manure?  I'm sorry, is

18   there any benefit to the feedlot to turning the manure?

19   A.   Well, they like us real well.  The EPA really likes

20   us --

21   Q.   Why is that?

22   A.   Well, because we're taking this resource out over so

23   many more acres, so much further away from the source that

24   they really like that.  And then raw manure is very

25   volatile.  You know, it -- it leaches; it will wash in the

1   groundwater and stuff.  And our compost, those nutrients are

2   stable.  The composting process nu- -- stabilizes those

3   nutrients.  It turns most of the nitrogen into organic

4   nitrogen, which is very stable.  It won't leak.  In fact,

5   it's the most stable form of nitrogen, whereas raw material

6   will leach and go places.

7   Q.   Is the moving of the manure off the farm important --

8   and when I say "farm," I'm talking about the -- this

9   feedlot -- is the moving of the manure off the feedlot

10  important to the people that own the feedlot?

11  A.   Well, yeah, they've got to get rid of it.  Yes.

12  Q.   Uhm-hum.  And if -- if you don't do it, does somebody

13  else do it?

14  A.   They have other -- there's manure haulers -- I don't

15  use all the manure there by any means.  There's manure

16  haulers there that just haul the raw manure out.

17  Q.   How did -- how do they do it?

18  A.   Well, they just do the same.  They load the piles into

19  pens and they just haul it out to farms and then they spread

20  the raw manure, whereas we spread the compost.  But our

21  product will go a lot further than the raw manure will.

22  Q.   And you indicated -- so does it affect the productivity

23  of the feedlot if the manure isn't moved?

24  A.   If it isn't moved?

25  Q.   Yes.

1    A.    Yes, very much.   Cattle -- you know, if cattle walking

2    around in deep manure, and when it's wet and all, and they

3    get that manure stuck to their hair, the efficiency of

4    feeding them goes way down.

5    Q.    Okay.   Is this processing of manure the only activity

6    that Humalfa and your company engage in?

7    A.    It is.

8    Q.    And have you ever had any complaints about not

9    processing enough manure?

10   A.    Well, I have there at Yuma.   You know --

11   Q.    Tell us what happened.

12   A.    Well, the yard just -- we was lacking a lot of manure

13   in the yards.   And the man that I work with, they're in the

14   feedyards -- you know, he's kind of joshing me and kidding

15   saying, "Man, what's going on?   You need to get things going

16   here.   We've got a lot of manure in the pens piled up.   We

17   need it hauled out."

18   Q.    And who was in charge of that, at that time that he

19   complained?

20   A.    In charge for us?

21   Q.    Yeah.

22   A.    Chris.

23   Q.    Okay.

24   A.    That was what he needed to be doing, and he's showing

25   up at 9:00, 9:30 in the morning to start.

1    Q.    Did you ever talk to Heather about the fact that he was

2    showing up at 9:00 or 9:30?

3    A.    Probably.

4    Q.    Did you ever ask her to dock hours because he was

5    showing up at 9:00 or 9:30?

6    A.    No.

7    Q.    Why not?

8    A.    Well, I just didn't -- I just didn't.  I don't know.

9    Q.    Was it -- was it hard to find somebody to work -- to do

10   Chris' job in the -- in the feedlot?

11   A.    No, there are plenty of people that would work.

12   Q.    Uhm-hum.

13   A.    But you want -- you know, then that's just another

14   person you do have to train and -- you know what I mean.  So

15   there's --

16   Q.    Yeah.  And did Chris only work in the feedlot?

17   A.    Did he work for the feedlot?

18   Q.    No, did he only work in the feedlot?

19   A.    Pretty much.  He did a little spreading for us, but

20   very little.

21   Q.    Uhm-hum.  Okay.

22            MR. DAVIS:  One moment, Your Honor.

23            THE COURT:  Okay.

24            MR. DAVIS:  Plaintiffs' counsel kind of threw me

25   off a little bit.  I'm doing this in reverse order, so . . .

 1    BY MR. DAVIS:

 2    Q.    Explain to us what -- you mentioned CAFO.  C-A-F-O.

 3    A.    Confined Animal Feeding Operation.

 4    Q.    Yeah.  Explain that to us.

 5    A.    Well, that's just -- I think it's a Department of

 6    Agriculture gives you that CAFO permit.  It's a permit that

 7    these confined animal feeding operations, if they feed over

 8    a thousand head, they need a CAFO permit.

 9    Q.    And what does that permit say?

10    A.    Well, I don't know.  I've never seen one -- read one,

11    but what it does is it outlines the drainage and the way the

12    feedyard drains and, you know, to control the runoff.  The

13    main thing, the feedyards have to control the runoff.

14    Nothing can leave the feedyard.  In other words, they all

15    have to stay within that place.  So they dig lagoons and

16    runoff goes into these lagoons and they catch it there.

17    Q.    Would the -- would the manure affect the ability of the

18    farm -- of that runoff if it wasn't picked up?

19    A.    Yes.  Yeah.  And then Yuma seems to get more rain than

20    a lot of us, and, you know, those pens, if they're not

21    cleaned up and piled up and all, why it just gets wet,

22    however deep the manure is.  And there again, cattle don't

23    feed good in that environment.

24    Q.    Uhm-hum.  So this cleaning of the manure from the place

25    where the cattle are fed is important to the farm.

1    A.    Oh, yes.   Very.

2    Q.    Okay.   And if the -- if the farm doesn't do that, or if

3    somebody doesn't do it for the farm, then they wouldn't be

4    able to raise the cattle?

5    A.    Yes.   You -- you have to take care of -- if you want to

6    feed cattle, you have to do the manure management, yes.

7    Q.    Okay.   You mentioned before about the ag exempt status.

8    You were -- you've always been ag exempt.

9    A.    Uhm-hum.   Yes.

10   Q.    Everybody in your business is ag exempt.

11   A.    As near as I know.

12   Q.    And when you had that put in the employee manual, an

13   attorney advised you about that.

14   A.    Yes.

15   Q.    Is there anything that you have learned -- other than

16   the change in the statute that they recently made, anything

17   that you learned during that time that would make you

18   believe that those -- that the employees that worked there

19   were not ag exempt?

20   A.    Nothing that I'm aware of.

21   Q.    And the other people that work for you are also -- you

22   also consider them to be ag exempt workers?

23   A.    Yes.   Everybody has been happy that way.

24   Q.    Did you -- were you aware of how much BreeAnna Porter

25   actually worked or not worked?

1    A.    Well, not until this deal.  I kind of lost track of it.

2    But . . .

3    Q.    Okay.

4    A.    You know, I had a pretty good idea how much she was

5    supposed to work and all, and she wasn't -- up until we

6    hired her, she was there at the feedyard with Chris all the

7    time riding around with him, so she figured out how to drive

8    a truck.  And they talked me into letting her drive a truck,

9    and so that was the last group of hours that you see there

10   in '21 or whatever.

11         Well, she was driving the manure truck, hauling

12   manure from the pens out to the compost yard.

13   Q.    Uhm-hum.  And nobody was supervising her or keeping her

14   hours?

15   A.    Just her and -- yeah, just her.

16   Q.    And she was the one that reported her own hours.

17   A.    Yes.

18   Q.    And the hours that she reported were reflected on the

19   payroll reports.

20   A.    Well, absolutely.

21         MR. DAVIS:  Okay.  No further questions.

22         THE COURT:  Redirect.

23                    REDIRECT EXAMINATION

24   BY MR. SANFORD:

25   Q.    Mr. Crowder, I'm going to ask you to switch notebooks

1    and open to the fourth tab.

2    A.    Switch what?

3    Q.    Switch notebooks.  And open to tab 4 and page 13 of

4    that, which it's going to be down at the bottom where it

5    says different page.

6    A.    What?

7    Q.    13.  It's down at the bottom in the right-hand corner.

8    A.    I see it.

9    Q.    Okay.

10   A.    Okay.

11         MR. DAVIS:  I'm sorry, what exhibit?

12         MR. SANFORD:  I'm on 4 in my book, starting at page

13   13.

14         MR. DAVIS:  Okay.

15   BY MR. SANFORD:

16   Q.    Just leave that there for a second and I'll get to it.

17   I just wanted to get it open.

18         In the other notebook, there's a coaching document

19   about Mr. Porter showing up at 9:00 some days, or showing up

20   late.  Right?

21   A.    Yes.

22   Q.    Okay.  He wasn't fired for that, right?

23   A.    He wasn't?

24   Q.    Correct.

25   A.    Well, not -- no, not all the time.  I -- that's

1    eventually what got him laid off, yes.

2    Q.   Well, that coaching was from 2018, correct?

3    A.   That what?

4    Q.   That coaching document -- that write-up.

5    A.   Yeah, that was from 2018.  So -- and, no, he wasn't

6    laid off for that.

7    Q.   Right.  And there were no other write-ups in '19, '20,

8    '21, until the wheels came off in '22, correct?

9    A.   That's right.  And we got to watching him in '22 and we

10   figured out what he was doing.  He was -- and I did know

11   that he was doing it because I talked to him about it a time

12   or two, that, "Why don't you get to work on time?"

13        "Well, I got to take my daughter to school."

14   Q.   You -- you loaned him money from time to time to deal

15   with his legal issues, correct?

16   A.   Yes, sir, several times.

17   Q.   And he paid you back by having you withhold a little

18   bit of his pay each week.

19   A.   Yes.

20   Q.   But then from time to time, he or BreeAnna would say to

21   you, "We actually would like to skip a loan payment this

22   paycheck because we're hard up," and you would grant that

23   request sometimes.

24   A.   Generally, yeah.

25   Q.   Yeah.  If Mr. Porter's hours from the Yuma lot were

1    noticeably higher than the other manure handlers at their

2    lots, you could have brought in the payroll documents, the

3    hours-worked documents, from all the other manure handlers

4    to show from a statistical standpoint that his hours were

5    inflated, correct?

6    A.    I suppose I could have.

7    Q.    Okay.  You and Mr. Davis talked briefly about the --

8    your -- the value of the removal of the manure from your

9    customers' lots and I want to follow up on that briefly.

10   The cattle were being raised for meat and meat products, not

11   for their manure, correct?

12   A.    No -- yes, they were being raised for beef.

13   Q.    Yeah.  The -- the fertilizer that ends up being the

14   result of the improvement through time of the Humalfa

15   process on the manure is not used to enrich the cattle of

16   that operator.

17   A.    No, it -- it's --

18   Q.    It goes other places.

19   A.    Yes.

20   Q.    Okay.  Finally, these cattle operations must have the

21   manure removed, right?

22   A.    Yes.

23   Q.    But it's not necessary that that manure be converted

24   into fertilizer.

25   A.    It's already fertilizer.

1   Q.    I'm sorry, not being proved into Humalfa-grade

2   fertilizer.

3   A.    That's right.

4   Q.    That's not necessary; the removal is what's necessary.

5   A.    Yes.

6   Q.    Okay.  Now, let's look at page 13 real quick.  At the

7   bottom, December 4th, did BreeAnn say, "Please" -- well, I'm

8   adding the word "please" -- did she say, "Clock in Chris

9   Porter at 9:00 today"?

10   A.    Yes.

11   Q.    Okay.  Now switch to page 20.  That's seven pages

12   ahead.  I'm looking at January 27th.  And you tell me when

13   you are on page 20 --

14   A.    I'm here.

15   Q.    Did she turn in a 9:02 start time for him?

16   A.    Yes.

17   Q.    Okay.  Just turn two more pages to -- can't talk -- to

18   January 31st.  Did she turn in an 8:29 clock time for him?

19   A.    Yes.

20   Q.    We're going to turn two more pages.

21   A.    But right below that there's a clock-in time of 6:45.

22   And I'm sure being a Monday, unless school was out, why

23   that's not correct.

24   Q.    Okay.  But you do see the one that I'm talking about,

25   the --

1    A.    Which -- which one are we talking about?

2    Q.    Well, I asked you about page 22.  December --

3    January --

4    A.    Yeah.

5    Q.    January 31st, clock-in time, 8:29.

6    A.    Yes.

7    Q.    Okay.  Let's skip to page 24.  And this is the second

8    to last page.  On February 2d, did he clock in for 1:00 p.m.

9    that day?

10   A.    Yes.

11   Q.    Okay.  And then one more page on Saturday,

12   February 6th, do you show him clocking in at 11:37 in the

13   morning?

14   A.    Yes.

15              MR. SANFORD  Okay.  That's all I have, Your Honor.

16              THE COURT:  Okay.  Thank you.  Sir, you can step

17   down.  It's 10:00 now.  We've been going about an hour and a

18   half.  Given that this witness has just finished up, I think

19   this is probably a good time for our morning break.  So why

20   don't you -- yeah -- so why don't we break.  Typically I do

21   10 to 15 minutes but I'd actually like to break a little bit

22   longer because I'd like to talk with counsel in the back

23   briefly.  So why don't we -- why don't we plan to break --

24   why don't we break now and then when I'm done talking with

25   counsel, then we'll go for 10 to 15 minutes after that.

1    Okay.

2          (Recess taken 10:00 a.m. to 10:24 a.m.)

3          (This is the conclusion of the testimony)

4                    *       *       *       *       *

5                              INDEX

6    Item                                              PAGE

7                       PLAINTIFFS' WITNESSES

8          FARREL CROWDER
           Direct Examination by Mr. Sanford          2
9          Cross-examination by Mr. Davis             27
           Redirect Examination by Mr. Sanford        43
10

11                     REPORTER'S CERTIFICATE

12        I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled matter.

14        Dated at Denver, Colorado, this 1st day of March, 2024.

15

16

17
                     MARY J. GEORGE, FCRR, CRR, RMR
18

19

20

21

22

23

24

25