IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00808-STV

CHRISTOPHER PORTER; and
BREANNA PORTER,

    Plaintiffs,

v.

T.J. CROWDER AND SONS, LLC; and
FARREL CROWDER,

    Defendants.
_____

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
_____

Magistrate Judge Scott T. Varholak

This matter came before the Court for trial on February 26, 2024. [#44] The parties have consented to proceed before the undersigned United States Magistrate Judge for all proceedings, including entry of a final judgment. [##8, 9] At the conclusion of the trial, the Court took the matter under advisement. Having fully reviewed the evidence presented, applicable law and arguments of counsel, the Court now enters its Findings of Fact, Conclusions of Law and Order.

**I.    BACKGROUND**

Plaintiffs initiated this action on April 4, 2022. [#1] Plaintiffs' Complaint alleges: (1) violations of the Fair Labor Standards Act ("FLSA") for failure to pay federal minimum wages for all hours worked and failure to pay overtime wages and (2) violations of the Colorado Wage Act ("CWA") and the Colorado Minimum Wage Order No. 37 ("CMWO")

for failure to pay overtime wages and failure to permit Plaintiffs to take compensated rest breaks. [*Id.*]  A bench trial commenced on April 4, 2022. [#44]  After hearing testimony from a witness regarding liability, by agreement of the parties, the Court bifurcated the matter and agreed to first issue a ruling on whether the agricultural exception to the FLSA applied, with the question of liability for hours worked but not paid to Ms. Porter and any damages to be determined at a future date. [*Id.*]  Following the trial, each side submitted post-trial briefs. [##45, 46]

## II.     FINDINGS OF FACT

Defendant T.J. Crowder and Sons, LLC ("Humalfa") is a Colorado limited liability company doing business as Humalfa. [#45-1 at 2 (2:20-23)]  Defendant Farrel Crowder is the owner and managing member of Humalfa. [*Id.* at 3 (3:5-7)]  Humalfa is a composting company that converts raw cattle manure into organic fertilizer. [*Id.* at 7-8 (7:22-8:3)]  During the relevant time period, Humalfa always employed at least two, and usually approximately eight, employees. [*Id.* at 4 (4:10-19)]

The relevant feedlot where Humalfa operated was owned by Five Rivers Cattle Feeding ("Five Rivers"). [*Id.* at 6-4 (6:22-7:8)]  Neither Humalfa nor Mr. Crowder had any ownership interest in the feedlot or the feedlot's land. [*Id.* at 7 (7:14-18)]  Mr. Crowder testified that Humalfa is a separate operation from Five Rivers' feedlot and Humalfa paid for the creation of the compost yard. [*Id.* at 13 (13:22-24), 36 (36:6-12)]

Five Rivers' employees were responsible for cleaning the cattle pens and piling the manure in the pens. [*Id.* at 33-34 (33:18-34:3)]   Humalfa employees would then load the manure piles onto a dump truck and haul the manure to the compost yards where it would be unloaded. [*Id.* at 34-35 (34:14-35:7)]  The work hauling manure from the pens

2

was time sensitive because, if the manure was not timely removed from the pens, the cattle's movements would be restricted. [*Id.* at 11 (11:3-9)] The compost yards were located within Five Rivers' feedlot. [*Id.* at 7-8 (7:22-8:3), 34 (34:16-18)] Once the manure was unloaded, a machine would turn and compost the manure. [*Id.* at 14-15 (14:17-15:7)]. Mr. Crowder explained the process as follows: "By turning [the manure] and composting it, it allows that resource to be shipped a lot further. Raw manure, you can just afford to haul it 10, 15 mile[s] from the source here. But once you have composted it, that ton of compost will replace about 6 ton[s] of manure." [*Id.* at 15 (15:3-7)] The turning process takes approximately eight weeks. [*Id.* at 15-16 (15:21-16:5)] That fertilizer is then spread out on Five Rivers' feedlot and on other pastures 30-40 miles from Five Rivers. Mr. Crowder testified that the removal of the manure is essential to farm operations, and that the farm operations "like to have the fertilizer [cultivated by Humalfa] on the pastures." [*Id.* at 14 (14:9-11); 37 (37:16-19); 38 (38:7-11); 46-47 (46:20-47:4)] Five Rivers also employs manure haulers who simply remove the raw manure from the feedlot, and haul it to other farms to be spread. [*Id.* at 38 (38:12-21)]

Mr. Porter worked for Humalfa from 2007 through 2021, with a brief break in employment in early 2019 due to legal issues. His job was to load the piles of manure from the pens, haul manure from the cattle pens to the compost yard, and dump the manure in windrows for turning. [*Id.* at 10 (10:17-20), 34-35 (34:14-35:8)] Mr. Porter primarily held the title of "manure handler." [*Id.* at 10 (10:5-6)] He worked almost exclusively within the Five Rivers' feedlot. [*Id.* at 7 (7:3-8)] As a result of the time-sensitive and essential nature of the work, Mr. Porter's hours varied from week to week. [*Id.* at 11 (11:6-17), 19-20 (19:13-20:4)] On average, Mr. Porter worked 40-50 hours per

3

week, though some weeks he may have worked up to 70 hours. [*Id.* at 19-20 (19:13-20:8)]

Humalfa paid Mr. Porter's wages. [*Id.* at 32 (32:18-25)] Mr. Crowder was responsible for setting those wages. [*Id.* at 4 (4:3-5)] Mr. Porter was paid straight time for all hours worked and did not receive time and one-half for overtime wages. [*Id.* at 24 (24:4-8)] This was because Mr. Crowder believed that the FLSA's agricultural exemption applied. [*Id.*] During the relevant time period, Humalfa deducted thirty minutes per day for lunch but paid employees for 10-minute breaks every four hours. [*Id.* at 25 (25:14-24)] Ms. Porter would text or call Mr. Porter's hours worked to a Humalfa employee. [*Id.* at 16-17 (16:20-17:19)]

### III. CONCLUSIONS OF LAW

Under the FLSA, an employer must pay an employee overtime compensation at a rate not less than one and one-half times the regular rate at which the employee is employed for all hours that the employee works in a given week above 40 hours. 29 U.S.C. § 207(a)(1). Defendants argue that Mr. Porter was exempt from the FLSA's overtime provision pursuant to the agricultural employee exemption. [*See generally* #45] Defendants bear the burden of demonstrating that the agricultural exemption applies. *Archuleta v. Wal-Mart Stores, Inc.*, 543 F.3d 1226, 1233 (10th Cir. 2008). And "[i]t is well settled that exemptions from the Fair Labor Standards Act are to be narrowly construed." *Mitchell v. Kentucky Finance Co.*, 359 U.S. 290, 295 (1959); *see also Rodriguez v. Whiting Farms, Inc.*, 360 F.3d 1180, 1184 (2004) (specifying that exemptions are to be narrowly construed against the employers seeking to assert them). "[T]he employer must show that the employee fits plainly and unmistakably within the exemption's terms. . . .

4

An employer must prove that the employee is exempt by 'clear and affirmative' evidence." *Archuleta*, 543 F.3d at 1233 (quotation omitted). "The inquiry into exempt status . . . remains intensely fact bound and case specific." *Id.* (quotation omitted).

Under the FLSA, "any employee employed in agriculture" is exempt from the overtime pay requirement. 29 U.S.C. § 213(b)(12). The FLSA defines "agriculture" as including:

> farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities . . ., the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f). "The agricultural exemption was meant to apply broadly and to 'embrace the whole field of agriculture,' but 'it was meant to apply only to agriculture;' thus the critical issue is what is and what is not included within that term." *Rodriguez*, 360 F.3d at 1185 (quoting *Maneja v. Waialua Agric. Co.*, 349 U.S. 254, 260 (1955)).

The Tenth Circuit has interpreted the definition of agriculture in Section 203(f) to include "farming in both a primary and a secondary sense." *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1203–04 (10th Cir. 2004) (quoting *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 300 (1977)). Defendants argue that Humalfa's activity falls within the definition of secondary agriculture. [#45 at 5] To fall within the secondary sense of agriculture, Defendants must prove that Plaintiffs' work was: "(1) performed by a farmer or on a farm, and (2) incident to or in conjunction with such farming operations." *Pacheco*, 365 F.3d at 1205.

5

To begin, Humalfa's work as performed by Mr. Porter took place "on a farm." 29 U.S.C. § 203(f).  Mr. Porter loaded piles of manure from the feedlot pens into a truck, drove the truck to another area of the feedlot, and dumped the manure into rows.  Plaintiffs do not appear to seriously contest this point.  [#46 at 6 (arguing that "[t]he fact that the work is performed 'on a farm' is irrelevant")]  The primary dispute is whether Humalfa's work was incident to or in conjunction with farming operations.

The Code of Federal Regulations provides guidance as to when work is incident to or in conjunction with farming operations.  According to the regulations:

> Generally, a practice performed in connection with farming operations is within the statutory language only if it constitutes an established part of agriculture, is subordinate to the farming operations involved, and does not amount to an independent business. Industrial operations and processes that are more akin to manufacturing than to agriculture are not included. This is also true when on-the-farm practices are performed for a farmer.

29 C.F.R. § 780.144.  The Court must consider "the general relationship, if any, of the practice to farming as evidenced by common understanding, competitive factors, and the prevalence of its performance by farmers."  29 C.F.R. § 780.145.  Other factors the court may consider include:

> the size of the operations and respective sums invested in land, buildings and equipment for the regular farming operations and in plant and equipment for performance of the practice, the amount of the payroll for each type of work, the number of employees and the amount of time they spend in each of the activities, the extent to which the practice is performed by ordinary farm employees and the amount of interchange of employees between the operations, the amount of revenue derived from each activity, the degree of industrialization involved, and the degree of separation established between the activities.

*Id.*

In explaining the difference between qualifying incidental activities that are "carried on as part of the agricultural function" and non-qualifying activities that are "separately

6

organized as an independent productive activity," the United States Supreme Court has stated that "[w]hether a particular type of activity is agricultural depends, in large measure, upon the way in which that activity is organized." *Farmers Reservoir & Irrigation Co. v. McComb* ("*Farmers Reservoir*"), 337 U.S. 755, 760-61 (1949).  The Court explained that "[t]he fashioning of tools, the provision of fertilizer, the processing of the product, to mention only a few examples, are functions which [may be] performed on the farm by farmers as part of their normal agricultural routine," but may be completed through industrial processes under other systems.  *Id.* at 761.  To illustrate this divide, the Court contrasted "the compost heap" with "factory produced fertilizer," and power "derived from electricity and gasoline" with power "supplied by the farmer's mules."  *Id.*  As one final illustrative comparison, the Court concluded that "[t]he farmhand who cares for the farmer's mules or prepares his fertilizer is engaged in agriculture," while "the maintenance man in a power plant and the packer in a fertilizer factory are not."  *Id.* (footnotes omitted).

With these principles in mind, the Court concludes that Humalfa's work as performed by Mr. Porter qualifies as agricultural.  Indeed, Humalfa's operation at the Five Rivers feedlot appears to fit squarely within the quintessentially agricultural system of preparing fertilizer envisioned by the Supreme Court in *Farmers Reservoir*.  Far from acting as a "packer in a fertilizer factory," Mr. Porter was engaged in manually loading manure directly from livestock pens and transporting it to a "compost heap" located in a pasture on the same farm.  Once there, the manure was simply turned in the field for eight weeks, with no additives or further industrial processing.  *Cf. Mitchell v. Budd* 350 U.S. 473, 475-82 (1956) (holding that the tobacco drying process—which altered the tobacco leaves through minimal processing that occurred on the farm—qualified as part of the

"agricultural operation," while the "bulking process"—which required the "carefully controlled regulation of temperature and humidity" through the use of "a large amount of equipment" and took place at a separate processing facility off of the farm—did not); *see also* 29 C.F.R. § 780.145 (listing "the degree of industrialization involved" as a relevant factor in considering whether an activity is agricultural).

Moreover, while compost is not the primary product being prepared through Five Rivers' agricultural operation, the manure handling process is certainly incidental to (or performed in conjunction with) the primary livestock operation.  The removal of the manure is an undisputably integral step in the feedlot operation.  [#45-1 at 42 (42:5-6) ("[I]f you want to feed cattle, you have to do the manure management."), 46 (46:20-22) (agreeing that "these cattle operation must have the manure removed")]; *see Donavon v. Marrero*, 695 F.2d 791, 794-96 (3rd Cir. 1982) (holding that the removal of spent compost from mushroom beds and the disposal of that compost constituted "secondary agriculture" under the FLSA because the work took place on a farm and was an "integral step in the mushroom growing process").  The fact that, instead of simply disposing of the manure, Humalfa undertakes minimal processing of the manure on the farm does not alter this conclusion.  To the contrary, Humalfa's on-the-farm management of the manure only provides further benefit to the farming operation, supporting the notion that Humalfa's services are provided in conjunction with the primary feeding operation.  [#45-1 at 14 (14:9-12) (agreeing that Humalfa's services "help solve two problems for [the farm:] They need the manure out and they like to have the fertilizer on the pastures")]

Nor does the fact that Humalfa operates independently from Five Rivers disqualify their on-the-farm manure management operation as secondary agriculture. As the Supreme Court has explained:

> As originally introduced, the ["incident to or in conjunction with"] exemption covered such practices only if performed by a farmer. On the floor of the Senate it was objected that this would exclude the threshing of wheat or other functions necessary to the farmer if those functions were not performed by the farmer and his hands, but by separate companies organized for and devoted solely to that particular job. To take care of that situation [the] words "or on a farm" were added to the definition. Thus, the wheat threshing companies, even though they were separate enterprises, were included in the exemption because their work was incidental to farming and was done on the farm.

*Farmers Reservoir*, 337 U.S. at 767 (footnote omitted). Thus, the removal and disposal of mushroom compost could constitute "secondary agriculture," even though it was performed by an independent contractor who specialized in this "take-out" service. *Donovan*, 695 F.2d at 793, 795-96. Accordingly, even to the extent that Humalfa was operating as an "independent business" as contemplated by 29 C.F.R. § 781.144, the Court nevertheless finds that this factor is not dispositive. *See Bills v. Cactus Fam. Farms, LLC*, 5 F.4th 844, 848-49 (8th Cir. 2021) (rejecting a "mechanical application" of 29 C.F.R. § 780.144's three factor test, because "the total situation will control" (quoting 29 C.F.R. § 780.145)).

Finally, the Court notes that the parties did not elicit evidence about many of the factors set forth in the regulations—such as the amount of revenue derived from each activity, the sums invested in each operation, and the amount of payroll for each activity—and the Court is mindful that Defendants bear the burden of demonstrating that the agricultural exemption applies. *Archuleta*, 543 F.3d at 1233. In addition, there does not appear to be a significant interchange of employees between Humalfa's operation and

9

the livestock feeding operation, and there is a clear degree of separation between the operations. These factors weigh against the application of the exemption. 29 C.F.R. § 780.145; *see also Holly Farms Corp. v. N.L.R.B.*, 517 U.S. 392, 403 (1996) (finding that the N.L.R.B.'s conclusion that "live-haul crews"—teams of chicken catchers, forklift operators, and truckdrivers who collect chickens for slaughter—were not agricultural laborers was reasonable, in part, because there was "minimal overlap between the work of the live-haul crew and the independent growers" who raised the chickens). However, the Court is also cognizant of the instruction to look to the "common understanding" of the "total situation." 29 C.F.R. § 780.145. Here, Mr. Porter (pursuant to his title of "manure handler") loaded piles of cow manure from feedlot pens onto a truck, drove the manure to a compost yard on the feedlot, and unloaded the manure into windrows. Ultimately, as far as "common understanding" goes, the Court agrees with the sentiment expressed by Mr. Crowder at trial: "You don't get more ag than dealing with cattle manure; that's about as ag as it gets." [#45-1 at 8 (8:24-25)]

For the foregoing reasons, the Court concludes that Humalfa's on-the-farm manure handling operation constitutes "secondary agriculture" and that the agricultural exemption does apply to Humalfa's operations as performed by Mr. Porter.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that the agricultural exemption does apply to Mr. Porter's work and thus finds in favor of Defendants as to liability on his FLSA overtime violation claim. A status conference is set for June 4, 2024.

DATED:  May 10, 2024

BY THE COURT:

s/Scott T. Varholak
United States Magistrate Judge